IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**FILED**

JUN - 4 2003

SAMUEL L. KAY, CLERK
U. S. District & Bankruptcy Courts
Southern District of West Virginia

DAVID PEYTON,

        Complainant,

v.

HUNTINGTON HERALD DISPATCH,

        Respondent.

**DOCKET NO. EAD-165-02
(Before the West Virginia
Human Rights Commission)**

**EEOC NUMBER 17JA200032**

## NOTICE OF REMOVAL

TO:   MS. IVIN B. LEE
      Executive Director
      State of West Virginia Human Rights Commission
      1321 Plaza East, Room 108A
      Charleston, West Virginia  25301-1400

      THE HONORABLE SAMUEL L. KAY, CLERK
      United States District Court
      Southern District of West Virginia
      Federal Building, Room 2400
      300 Virginia Street, E.
      P.O. Box 3924
      Charleston, West Virginia 25339

      HOYT GLAZER, ESQ.
      Law Offices of Stuart Calwell PLLC
      405 Capitol Street, Suite 607
      Charleston, West Virginia 25301-1727

Please take notice of the removal of the above-captioned case from the West Virginia Human Rights Commission to the United States District Court for the Southern District of West Virginia, at Charleston, upon the following grounds:

1. On November 16, 2001, an action was commenced before the West Virginia Human Rights Commission by the filing of a Complaint of Discrimination alleging age and handicap discrimination in violation of *The West Virginia Human Rights Act*, W.Va. Code §§ 5-11-1 *et seq.* Copies of the Charge of Discrimination and the Commission's Determination are appended hereto as Attachments A and B, respectively.

2. On May 5, 2003, Complainant clarified his alleged cause of action in sworn testimony. During this deposition, it became clear that Complainant does not assert a claim of age or disability discrimination under the West Virginia Human Rights Act, but rather clearly asserts a cause of action under the federal *Employee Retirement Income Security Act*, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). It is now abundantly clear that Mr. Peyton claims that the Huntington Herald-Dispatch discharged him to deprive him of future medical benefits and increases in his pension under applicable pension and welfare benefit plans. Mr. Peyton's claim is a superseding ERISA action "to recover benefits due to him under the terms of his plan(s), to enforce his rights under the terms of the plan(s), or to clarify his rights to future benefits under the terms of the plan(s)," as provided for in 29 U.S.C. §§1132(a)(1)(B). A copy of the transcript of Mr. Peyton's sworn testimony is appended hereto as Attachment C.

3.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331, in that it arises under certain laws of the United States set forth in the *Employee Retirement Income Security Act*, 29 U.S.C. §§ 1001 *et seq.* This is an action of a civil nature founded upon a claim or right arising, if at all, under the laws of the United States. Consequently, this court has removal jurisdiction pursuant to 28 U.S.C. §1441(b) without regard to citizenship or residence of the parties.

4.    This Notice of Removal was filed within 30 days of the Huntington Herald-Dispatch's first notice that Respondent actually alleges a cause of action under the federal *Employee Retirement Income Security Act*, 29 U.S.C. §§ 1001 *et seq.* rather than a state claim.

5.    Copies of all pleadings filed in this matter, exclusive of those enumerated above, are apended hereto as Attachment D.

Respectfully submitted,

HUNTINGTON HERALD-DISPATCH,

By Counsel

Joseph M. Price, Esq. (W.Va. State Bar No. 2981)
ROBINSON & McELWEE PLLC
500 Virginia Street, East
600 United Center
Charleston, WV 25301
(304) 344-5800

3

## VERIFICATION

STATE OF WEST VIRGINIA     )
            )   TO-WIT:
COUNTY OF KANAWHA    )


    I, Joseph M. Price, after having been first duly sworn, says that he has read the foregoing "Notice of Removal" and he knows the contents thereof; further that the facts and allegations contained therein are true, except as such are therein stated to be upon information and belief, and that as to such allegations, he believes them to be true.

                _____
                Joseph M. Price

    SUBSCRIBED, SWORN AND ACKNOWLEDGED before me, the undersigned Notary Public, this _4th_ day of June 2003.


                _____
                Notary Public

My Commission Expires:

_August 20, 2007_

OFFICIAL SEAL
NOTARY [...]
STATE OF W[...]
TAMMY [...]
501 [...]
SOUTH CH[...]
My Commission [...] 2007

4

NOV-20-2001  20:19        THE HERALD DISPATCH                    304 526 2858      P.01/01



## STATE OF WEST VIRGINIA HUMAN RIGHTS COMMISSION
### 1321 Plaza East
### Room 108A
### Charleston, WV 25301-1400

TELEPHONE (304) 558-2616
FAX (304) 558-0085
TDD - (304) 558-2976
TOLL FREE: 1-888-676-5546

Bob Wise
Governor

Ivin B. Lee
Executive Director

November 16, 2001

TO:   DAVID PEYTON
      3556 MOUNT UNION RD.
      HUNTINGTON, WV 25701

                    Complainant,

v.                              DOCKET NO: EAD-165-02

      HUNTINGTON HERALD DISPATCH
      946 FIFTH AVE
      HUNTINGTON, WV 25701

                    Respondent.

### NOTICE OF DISCRIMINATION COMPLAINT

       You are hereby notified that the attached complaint Article 11, Chapter 5, of the Code of West Virginia, as amended (hereinafter referred to as the Act) has been filed.

       Your attention is directed to the West Virginia Code 5-11-8(c) and the Rules Pertaining to Practice & Procedure Before the West Virginia Human Rights Commission. Pursuant to these rules and specifically Rule 4.20, a Written reply shall be filed by the Respondent within ten (10) days and a copy shall be served/mailed to the Complainant. You are further notified as follows:

1.     77-2-4.4.2(a) Any person against whom a complaint has been filed shall serve upon the Commission and Complainant a written reply to the complaint within ten (10) days of receipt of the complaint. Such reply shall contain a statement of the facts and circumstances surrounding the allegations contained in the complaint and any present documents of other evidence related to the subject matter of the complaint. This reply is in addition to the verified answer required in Rule 77-2-6.6.1.

2.   The West Virginia Human Rights Commission's Rules and Regulations specifically rule 77-2-3.14 provides that where a charge of discrimination has been filed, or an action brought by the agency against any party under the Act, the Respondent shall preserve all personnel or other records relevant to the charge or action until final disposition of the complaint or action.  The term "personnel or other records relevant to the complaint of action," for example, would include personnel/employment or any other records relating to the aggrieved person and to all other persons similarly situated to the aggrieved person.  The "date of final disposition of the complaint or action" means the date the West Virginia Human Rights Commission issued its final closing order.  A failure to preserve the above mentioned records will be considered a violation of the West Virginia Code 5-11-14 as amended, and will subject the violator to the penalties specified therein.

3,   The West Virginia Code: 5-11-9(i) prohibits threats, retaliation and any form of reprisals against any person who has filed a complaint or assists in prosecution of complaint.

For future inquires on this matter, please use the West Virginia Human Rights Commission charge number shown above.

WILLIAM D. MAHAN
DIRECTOR OF FIELD OPERATIONS

Enclosure: Copy of complaint with Certificate of Service

. NOV-20-2001  20:14        THE HERALD DISPATCH                304 526 2858      P.03



## STATE OF WEST VIRGINIA HUMAN RIGHTS COMMISSION

**1321 Plaza East**
**Room 108A**
**Charleston, WV 25301-1400**

**Bob Wise**
Governor

TELEPHONE (304) 558-2616
FAX (304) 558-0085
TDD - (304) 558-2978
TOLL FREE: 1-888-676-5546

Ivin B. Lee
Executive Direct

## CERTIFICATE OF SERVICE

I, Leona Chupick, an agent of the West Virginia Human Rights Commission do hereby certify that I have served the enclosed Letter of Complaint(s) upon:

David Peyton
**COMPLAINANT**

Huntington Herald Dispatch
**RESPONDENT**

**Address:**
3556 Mount Union Road
Huntington, WV 25701

**Address:**
946 Fifth Avenue
Huntington, WV 25701

By mailing a true copy thereof by United States mail, on the _16th_ day of _November_, 2001.

_Leona Chupick_
LEONA CHUPICK
Agent for the West Virginia
Human Rights Commission

## STATE OF WEST VIRGINIA HUMAN RIGHTS COMMISSION

|  |  |  |
|---|---|---|
| | :: | DOCKET NO. |
| | :: | |
| On the complaint of | :: | EAD-165-02 |
| | :: | COMPLAINT |
| DAVID PEYTON | | |
| Complainant | :: | |
| | :: | |
| | :: | |
| HUNTINGTON HERALD DISPATCH | | |
| | :: | |
| Respondent | :: | |
| | :: | |

I, David Peyton

residing at  3556 Mount Union Road, Huntington, WV 25701

charge  Huntington Herald Dispatch

whose address is  946 Fifth Avenue, Huntington, WV 25701

With an unlawful practice within the meaning of the West Virginia Human Rights Act (Art. 11, Chapter 5, Code of West Virginia) as amended, and specially within the meaning of subsection (a) of Section (9) of said Act, because of my RACE___, RELIGION___, COLOR___ , NATIONAL ORIGIN___, ANCESTRY___, SEX___, AGE_X_, BLINDNESS__, DISABILITY_X_, or REPRISAL__.

Date of incident, on or about  June 12, 2001

The facts on which the aforesaid charge is based are as follows:

I.    On or about June 12, 2001, the Respondent, the Huntington Herald Dispatch, terminated me from my position of employment.

II.    I have been discriminated against due to my Age, 57, and my Disabilities, Necrosis of Cartilage and Scar Tissue of Hip Joint, and any other disabilities, whether actual or perceived, in that:

    A.    Respondent had employed me since 1968 and as a Columnist, since 1986.

    B.    The Respondent is aware of my age and health problems.

NOV-20-2001   20:15          THE HERALD DISPATCH                                504 528 2058      P.06

C.      Respondent believed that the combination of my age and my health will result in additional health costs and therefore, they terminated me from my position of employment in order to avoid payment of my salary, pension and healthcare benefits.

D.      I had an excellent work record and my disability did not interfere with my ability to perform the essential tasks associated with my position of employment.

E.      I have been discriminated against due to my Age and my Disability.

I have not commenced any action, civil or criminal, based upon the grievance set forth above, except

_____

_____

STATE OF WEST VIRGINIA          )
                                )ss: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         x _David A Peyton_
COUNTY OF _Cabell_              )                         (Signature of Complainant)

_David A Peyton_____, being duly sworn, deposes and says that: that _____ he is the Complainant herein; that _____ he has read the foregoing complaint and know the content thereof; that the same is true of his_____ own knowledge except as to the matters therein stated on information and belief; that as to those matters _____ he believes the same to be true.

Subscribed and sworn to before me
this _29_ day of _October_____, 2001          x _David G. Peyton_
                                                   (Signature of Complainant)

_Frank Lambertus #_
(Signature of Notary Public or Attorney)

My Commission Expires: _March 12, 2002_                      SLB



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
FRANK LAMBERTUS II
729 NINTH AVENUE
HUNTINGTON, WV 25701
My Commission Expires   March 12, 2002



## STATE OF WEST VIRGINIA HUMAN RIGHTS COMMISSION
### 1321 Plaza East
### Room 108A
### Charleston, WV 25301-1400

TELEPHONE (304) 558-2616
FAX (304) 558-0085
TDD - (304) 558-2976
TOLL FREE: 1-888-676-5546

**Bob Wise**
**Governor**

**Ivin B. Lee**
**Executive Director**

## IN THE MATTER OF:

DAVID PEYTON,

      Complainant,

v.                                    CASE NUMBER:   EAD-165-02

HUNTINGTON HERALD DISPATCH,

      Respondent.

**DATE COMPLAINT DOCKETED:**   10-30-01

**DATE COMPLAINT SERVED:**      11-16-01

## DETERMINATION

Under the authority vested in me by the West Virginia Human Rights Act, as amended, I issue on behalf of the West Virginia Human Rights Commission the following determination regarding the above styled charge.

The Complainant, David Peyton, is a 57 year old (at date of incident) male who suffers from Disabilities, Necrosis Of Cartilage and Scar Tissue Of Hip Joint. Complainant states that he had been employed since 1968 by the Respondent, and as a Columnist since 1986. Complainant states that on June 12, 2001, the Respondent

"B"

terminated him from his employment, even though the Complainant had an excellent work record and his Disabilities did not interfere with his ability to perform the essential tasks associated with his position. Complainant states that Respondent believed that the combination of Complainant's age and health would result in additional health costs, and, therefore, terminated the Complainant to avoid payment of Complainant's salary, pension, and health care benefits. Complainant, therefore, charged Respondent with *AGE DISCRIMINATION and DISABILITY DISCRIMINATION* in employment, which if either or both are substantiated, would be a violation of the West Virginia Human Rights Act, as amended.

Respondent denies Complainant's charge of age and disability discrimination.

Following a full and impartial investigation, the West Virginia Human Rights Commission hereby finds that there is **PROBABLE CAUSE** to believe that the Respondent has engaged in unlawful discrimination or otherwise violated the West Virginia Human Rights Act.

Pursuant to the West Virginia Human Rights Act, this case has been assigned to **Administrative Law Judge, Robert B. Wilson,** who will schedule a public hearing on this matter.

If the Complainant **does not have Private Counsel,** pursuant to §5-11-10 of the West Virginia Human Rights Act, the case in support of the Complainant will be presented by an Attorney from the Attorney General's Civil Rights Division.

Notice regarding the public hearing will be forthcoming.

ENTERED this _16th_ day of August, 2002.

ON BEHALF OF THE WEST VIRGINIA
HUMAN RIGHTS COMMISSION

BY: _____
WILLIAM D. MAHAN
DIRECTOR OF COMPLIANCE/
ENFORCEMENT

WDM/jek

# CERTIFICATE OF SERVICE

I, **WILLIAM D. MAHAN,** Director Of Compliance/Enforcement, of the West Virginia Human Rights Commission, do hereby certify that I have served the enclosed *LETTER OF DETERMINATION* upon:

| **COMPLAINANT:** | **RESPONDENT:** |
|---|---|
| David Peyton | Huntington Herald Dispatch |
| 3556 Mount Union Road | 946 Fifth Avenue |
| Huntington, WV 25701 | Huntington, WV 25701 |

| **ATTORNEY/CONTACT:** | **ATTORNEY/CONTACT:** |
|---|---|
| Hoyt Eric Glazer, Esquire | William A. Behan, Director |
| Law Offices Of Stuart Calwell | Labor Relations And Labor Counsel |
| P. O. Box 113 | Gannett Co., Inc. |
| Charleston, WV 25321 | 7950 Jones Branch Drive |
| phone 343. 4323 | McLean, Virginia 22107-0720 |
| 304 - | |

By mailing a true copy thereof by United States Mail, on the ____/0____ day of August, 2002.

BY: _____

WILLIAM D. MAHAN
DIRECTOR OF COMPLIANCE/
ENFORCEMENT

## Peyton vs. Herald-Dispatch Docket No. EAD-165-02 David Peyton on 5-5-03

---

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

3

DAVID PEYTON,

        Plaintiff,

vs.            DOCKET NO. EAD-165-02

HUNTINGTON HERALD-DISPATCH,

        Defendant.

        The deposition of DAVID PEYTON was taken pursuant to the West Virginia Rules of Civil Procedure in the above-entitled action on the 5th day of May, 2003, commencing at 10:00 a.m. and concluding at 12:10 p.m., at the offices of Robinson & McElwee, 600 United Center, 500 Virginia Street, East, Charleston, Kanawha County, West Virginia, before Nancy McNealy, Certified Verbatim Court Reporter, duly certified by the West Virginia Supreme Court of Appeals and Commissioner for the State of West Virginia, pursuant to Notice.

I N D E X

| Witness: | Examination by Mr. Price |
|---|---|
| David Peyton | 4 |

| Exhibits: | Marked |
|---|---|
| No. 1, Policy Amendment I | 4 |
| No. 2, News to Know, 2-26-01 | 6 |
| No. 3, News to Know, 2-27-01 | 7 |
| No. 4, Memorandum 2-28-01 | 9 |
| No. 5, Memorandum 6-20-01 | 10 |
| No. 6, Internet Listing | 21 |

Signature Page.............................. Page 76

Errata Sheet................................ Page 77

Reporter's Certificate...................... Pages 78/79

---

2

APPEARANCES:    ON BEHALF OF THE PLAINTIFF:

        HOYT ERIC GLAZER, Attorney at Law

        The Calwell Practice

        405 Capitol Street

        Suite 607

        Charleston, West Virginia 25301

        ON BEHALF OF THE DEFENDANTS:

        JOSEPH M. PRICE, Attorney at Law

        Robinson & McElwee, PLLC

        Post Office Box 1791

        Charleston, West Virginia 25326-1791

        and

        WILLIAM A. BEHAN, Director/Labor Relations & Labor Counsel

        GANNETT

        7950 Jones Branch Drive

        McLean, Virginia 22107-0720

ALSO PRESENT:    LESLIE HURST

---

Mr. Peyton - Examination    4

1    (Witness sworn.)

2  THEREUPON,

3      D A V I D  P E Y T O N

4  after having been administered an oath or affirmation on

5  the record by the Deposition Officer, testified as follows:

6      EXAMINATION

7    BY MR. PRICE:

8    Q  Mr. Peyton, as you know, I'm going to ask

9  you a series of questions today about your claims in this

10  case and matters related to this case. If there's any

11  question that I ask you that you don't understand, please

12  ask me to rephrase it or repeat it.

13    I want the testimony that you give here

14  today to be your testimony. I have a tendency from time to

15  time to interrupt witnesses. I don't mean to do that, and

16  if I interrupt you, feel free to just go ahead and complete

17  your answer because we want your testimony to be complete

18  and accurate as we go through it.

19    A  Okay.

20    MR. PRICE:  Let me start out -- let's go

21  ahead and mark that, Nancy.

22    (WHEREUPON, the Amendment I was

23    marked as Deposition Exhibit No.

---

**Peyton vs. Herald-Dispatch Docket No. EAD-165-02 David Peyton on 5-5-03**

Mr. Peyton - Examination      5

1              1 for purposes of identification

2           and a copy of which is attached

3           hereto and made a part hereof.)

4    BY MR. PRICE:

5      Q    Mr. Peyton, you now have in front of you

6 what's been marked as Deposition Exhibit 1. Can you tell

7 me what that is?

8      A    It is The Herald-Dispatch Electronic

9 Communication Policy Amendment I.

10      Q    Now looking through that, did you sign

11 that?

12      A    Yes, I did.

13      Q    Do you recall when you signed it or the

14 circumstances under which you signed it?

15      A    Yes. It was some time on the morning of

16 the 7th, April 7th, 2000, as I recall, and Bob Gabordi came

17 by my desk as well as the desks of other people in the

18 newsroom and handed this to me and to others in the

19 newsroom and said, "Here, read this and sign it," and then

20 five minutes or ten minutes, he came back and picked it up.

21      Q    Did you follow his instructions; did you

22 read it?

23      A    Yes.

Mr. Peyton - Examination      6

1      Q    And I assume that's your signature on it as

2 well?

3      A    Yes.

4      Q    When you say it's Amendment I, were you

5 familiar with what I'll call the underlying electronic

6 communications policy?

7      A    Vaguely, yes.

8      Q    How had you become familiar with the

9 underlying policy?

10      A    If I'm not mistaken, I believe that I had

11 read about the policy and once again, I can't remember

12 because I had not been asked to sign anything prior to

13 this. I think I had read it somewhere, but I can't

14 remember where or when I read it.

15      Q    Do you recall the electronic communications

16 policy or any amendment of the policy being discussed in

17 any meetings or training sessions with you?

18      A    No, I don't recall that.

19    MR. PRICE:    Go ahead and mark that as 2.

20          (WHEREUPON, the News To Know of

21          February 26, 2001, was marked as

22          Deposition Exhibit No. 2 for

23          purposes of identification and a

Mr. Peyton - Examination      7

1          copy of which is attached hereto

2          and made a part hereof.)

3    BY MR. PRICE:

4      Q    Mr. Peyton, you've got in front of you now

5 what's been marked as Exhibit 2 to your deposition. If

6 you'd take just a minute to read that over, please.

7      A    (Witness complies.) I'm presuming that

8 you're referring primarily to the first paragraph?

9      Q    Yes.

10      A    Then I've read it.

11      Q    Okay. Do you recall seeing that before?

12      A    Not specifically. I know that these News

13 To Know flyers were posted at the elevators and in various

14 locations and I often would scan over them waiting for the

15 elevator to go up or down.

16      Q    But you don't have a specific recollection

17 of that one?

18      A    Not specifically, no.

19    MR. PRICE:    Okay, take a look at Exhibit 3 if

20 you would, please. I'm referring specifically to the first

21 two paragraphs of that one.

22    THE WITNESS:    (Witness complies.)

23          (WHEREUPON, the News To Know of

Mr. Peyton - Examination      8

1          February 27, 2001, was marked as

2          Deposition Exhibit No. 3 for

3          purposes of identification and a

4          copy of which is attached hereto

5          and made a part hereof.)

6    BY MR. PRICE:

7      Q    Do you recall that one?

8      A    Once again, not specifically, because here

9 again, this was not -- News To Know was not hand delivered

10 to each and every individual. They were posted at

11 strategic locations throughout the company, and I may have

12 glanced at it, but I don't recall specifically.

13      Q    In Exhibits 2 and 3 to your deposition, is

14 there any information contained in those related to the

15 electronic communications policy of which you were not

16 aware?

17      A    No.

18    MR. PRICE:    Take a look at Exhibit 4 if you

19 would, please, which is a February 28th, 2001, memorandum,

20 and I'll ask you if you've seen that before if you recall

21 its contents?

22          (WHEREUPON, the Memorandum of

23          February 28, 2001, was marked as

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                    9

1                     Deposition Exhibit No. 4 for

2                     purposes of identification and a

3                     copy of which is attached hereto

4                     and made a part hereof.)

5       THE WITNESS:   (Witness complies.)  Yes, I

6    recall this one, as I remember.  I suspect that this one

7    was delivered to each and every employee since it's a memo.

8    Although sometimes memos weren't not delivered to each and

9    every individual.  They were also just posted in strategic

10   locations throughout the building.

11      BY MR. PRICE:

12      Q    Do you have any specific recollection of

13   receiving this one or seeing it prior to today?

14      A    Yes.

15      Q    When did you see it if you recall?

16      A    I don't recall.

17      Q    And under what circumstances did you see

18   it?

19      A    Once again, I don't recall.  I don't recall

20   whether or not it was hand delivered as a memo to each and

21   every individual or whether it was posted on a bulletin

22   board near the elevator.

23      Q    But either way you recall seeing it and you

Mr. Peyton - Examination                                   10

1    understood its contents?

2       A    Uh-huh (yes).

3       MR. PRICE:    All right, take a look at No. 5

4    if you would, please.

5                     (WHEREUPON, the Memorandum of

6                     June 20, 2001, was marked as

7                     Deposition Exhibit No. 5 for

8                     purposes of identification and a

9                     copy of which is attached hereto

10                    and made a part hereof.)

11      THE WITNESS:   (Witness complies.)  Okay.

12      BY MR. PRICE:

13      Q    Do you recall seeing that one?

14      A    Yes.

15      Q    And do you recall the circumstances under

16   which you saw it?

17      A    Yes, it was sent to me after I was fired as

18   I recall by an employee of the company.

19      Q    Do you recall any information in that

20   particular piece of material that was a surprise to you?

21      A    One moment, let me check something.  There

22   was an addition in this which had not been stated

23   previously in this policy, and that is a reference to

Mr. Peyton - Examination                                   11

1    paragraph one, two, three, four.

2                     What peaked my curiosity here was that for

3    the first time the company or Ms. Hurst tells employees

4    what to do if they inadvertently access a website.  Prior

5    to this as I recall, there was no coverage on what to do in

6    a situation like that, inadvertently accessing a website.

7       Q    That's not your contention in this case,

8    however, that you inadvertently accessed a website, is it?

9       A    No.

10      Q    So that paragraph wouldn't apply to your

11   situation here, would it?

12      MR. GLAZER:    Just note an objection to form;

13   you may answer.

14      THE WITNESS:   I should answer?

15      MR. GLAZER:    No, you go ahead and answer.

16      THE WITNESS:   Restate the question, please.

17      BY MR. PRICE:

18      Q    Yeah, that paragraph that you're referring

19   wouldn't apply to the circumstances under which you were

20   discharged, would it?

21      A    No.

22      Q    What training or familiarization had you

23   had with the electronic communications policies, the

Mr. Peyton - Examination                                   12

1    reminders about the policy or the contents of the policy

2    while you were at The Herald-Dispatch?

3       A    Could you restate that again?

4       Q    What training did you have in the policy

5    while you were at The Herald-Dispatch?

6       A    Training?

7       Q    Sure.

8       A    When you say training, do you mean actually

9    somebody calling you into a meeting and explaining --

10   training you in what the electronic policy means?

11      Q    Let's start there, sure.

12      A    There was none as I recall.

13      Q    Did you have any meetings in which the

14   electronic communications policy was discussed with you by

15   any of your supervisors?

16      A    Not that I recall; however, Mr. Gabordi who

17   was executive editor at the time would often sort of have

18   these informal gatherings where he would gather us; say,

19   "All right, everybody come over here.  I want to say

20   something to you about something."

21                    Then he would talk for maybe two or three

22   minutes.  I'm not sure whether he ever did that or not.  I

23   don't recall that he did.  If he did, I may not have been

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                13

1  in the building.

2      Q    So it's your testimony that you don't

3  recall Mr. Gabordi having any discussion with you either

4  individually or in a group about the electronic

5  communications policy?

6      A    Not that I recall, no.

7      Q    Other than Mr. Gabordi, do you recall

8  anyone at The Herald-Dispatch having any conversation with

9  you concerning the electronic communications policy prior

10  to your discharge?

11      A    Say that again.

12      Q    Do you recall anyone at The Herald-Dispatch

13  having any conversation with you about the electronic

14  communications policy prior to your discharge?

15      A    Anyone, any employee or anybody?  Yes.

16      Q    All right, who?

17      A    I'm not going to say because basically what

18  I am talking about here are the informal discussions that

19  we employees had about the policy.

20      Q    Well, that's what I'm after.  So identify,

21  please, the discussions that you had --

22      A    I can identify the discussions.  Most of

23  the discussions were along the line of well, you know,

Mr. Peyton - Examination                14

1  we've got "big brother" at The Herald-Dispatch and they're

2  watching us.

3      Q    Do you recall specifically one or more

4  discussions that you had with any individual at The Herald-

5  Dispatch concerning the policy?

6      A    Not really.  It was just kind of talk about

7  -- water cooler type stuff that we talked about.

8      Q    Well, describe for me what you talked

9  about.

10      A    We talked about what the meaning behind the

11  policy was.  Whether or not they were monitoring -- whether

12  or not the company was monitoring our e-mail, whether or

13  not they could or would monitor our phone calls.  What they

14  were monitoring, and of course, employees being what they

15  are some are more paranoid than others.

16      Q    How many of those discussions do you recall

17  participating in?

18      A    Oh, just a couple.  I mean not, you know,

19  we're not talking about -- it wasn't the talk of the month

20  or the year or the century or anything.  It was, you know,

21  when we were out maybe on, you know, away from the

22  building, we would discuss it.

23      Q    When do you recall that, the issue of the

Mr. Peyton - Examination                15

1  policy first being discussed among the employees?

2      A    I would say it was probably soon after we

3  started reading these memos; probably shortly after

4  February.  I can't remember exact dates.

5      Q    With whom did you discuss it?

6      A    You know, there are still employees there

7  who I discussed it with, and I'm not really sure that I

8  ought -- that I need to do that.

9      MR. GLAZER:    Joe, can we get a protective

10  order on that?

11      MR. PRICE:    I just want to know who he

12  discussed it with.  That's not privileged; it's not

13  confidential.

14      MR. GLAZER:    Go ahead and answer.

15      THE WITNESS:    Well, in general terms I remember

16  discussing it with Jim Ross, who is an employee there.

17      BY MR. PRICE:

18      Q    Who is Jim Ross?

19      A    Jim Ross is -- well, he's a long-time

20  reporter there, and probably -- I remember also discussing

21  it with Pamela Bowen.  Pamela was on the news desk, but now

22  she's retired on disability.  Those are the two that I

23  remember talking about it primarily.

Mr. Peyton - Examination                16

1      Q    Okay, let's start with the discussion that

2  you had with Mr. Ross.  Tell me what the content of that

3  discussion was.  Think back and just tell me as best you

4  can what you said and what he said.

5      A    Well, as I recall, I said with discussions

6  with him -- and once again, I don't remember the time of

7  the day -- what do you think this means?  Do you think that

8  it means that the newspaper is monitoring everything we

9  write on all of our e-mails that we send on the company

10  computer and are they monitoring our phone calls; and if

11  so, is that legal.

12      Jim I remember saying -- Jim is a very very

13  conservative person.  He said, "I don't know.  I really

14  don't know about it, but I certainly," I think I remember

15  him saying, "I certainly hope they're not doing that,

16  because I think that's a violation of the privacy rights.

17      Q    Did you have just the single conversation

18  with Mr. Ross?

19      A    That's the one that I can recall primarily.

20      Q    All right, how about Ms. Bowen, the same

21  question.  Think back as best you can --

22      A    Pamela and I are long-time friends.  Our

23  relationship goes back to college days and if I recall, I

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                    17

1  was probably at her home talking about this policy and how
2  it seemed -- as I recall now, it was about how it seemed
3  like that this was very important to the newspaper, because
4  of all the stuff that was coming out about it; and our talk
5  wasn't so much about the internet, but in the case with Mr.
6  Ross, too, but it was more talking about what are they --
7  are they monitoring our e-mail, are they monitoring our
8  phone calls, can they do that; and if so, what does that
9  mean to our personal freedom.
10      Pamela and our discussion was a little more
11  heated and probably a little more full of paranoia because
12  both of us were -- go back to the '60s and that kind of
13  thing I think really kind of caused a great deal of concern
14  for us.
15      Q    When you say you had -- you believe you had
16  a discussion with Ms. Bowen at her home, was she still
17  employed by the paper at that point or had she left?
18      A    Yes, at that time she was as I recall.  I
19  don't think she had retired yet.
20      Q    After you had the conversation with Mr.
21  Ross or after you had the conversation with Ms. Bowen, did
22  you talk with anyone else at the paper about the policy?
23      A    Not that I recall.

Mr. Peyton - Examination                    18

1      Q    Did you ask anyone what it meant?
2      A    No.
3      Q    Did you ever talk with Mr. Gabordi, for
4  instance, and say, I have some confusion about the policy
5  or some questions about the policy?
6      A    No.
7      Q    What did you understand the monitoring to
8  be under the policy?
9      A    Well, from the looks of these memos --
10      Q    What did you understand them to be?
11      A    Well, okay, I understood that it was the
12  company's position that they could monitor any
13  communication that we had on any company equipment; that
14  included computer, any communication on the computer and
15  phone conversations.
16      Theoretically, I suppose, even things that
17  we wrote and sent out in company mail would be my -- I mean
18  I just thought that was the company's contention.
19      Q    That it could monitor virtually anything
20  that you produced or received?
21      A    Yes, through the company.
22      Q    Did you object to that at all?
23      A    You mean did I object to some --

Mr. Peyton - Examination                    19

1      Q    To the monitoring.
2      A    Personally, I did.
3      Q    Did you raise that objection with anybody
4  at The Huntington Herald-Dispatch?
5      A    No.
6      Q    Tell me what you understood the policy to
7  be as it related to your access of internet sites?
8      A    I understood it to mean that if I were
9  accessing internet sites of any kind, in a frivolous,
10  nonprofessional manner, whether they were what the company
11  deemed pornographic or not, that that could perhaps be a
12  problem for them.
13      Q    Show me in the policy where it talks about
14  anything that's frivolous or nonprofessional.  How do you
15  draw that distinction from the language of the policy?
16      A    I can't.
17      Q    Well, then why did you believe that was the
18  policy?  That it related only to frivolous or
19  nonprofessional access?
20      A    Maybe it's just an assumption of mine,
21  okay, but I really believe that what they were saying here
22  was -- because the reason that I say this is to me I think
23  it was mentioned at some point prior to my dismissal that

Mr. Peyton - Examination                    20

1  access of pornographic sites could result in discipline up
2  to and including -- disciplinary action up to and including
3  termination, and that's the one dated February 28, 2001.
4      My view of that particular policy was that
5  if I as an employee was spending time surfing the internet
6  looking for pornographic sites or any kind of site that
7  didn't have an end that was -- that didn't have an end
8  which would produce -- what would allow me to produce a
9  column, a story, whatever, would probably be wrong.
10      In addition to that, I think there was
11  probably -- the other thing that I thought was behind this
12  particular policy was that the company did not want those
13  types of -- certain types of websites to be displayed on
14  computer screens, particularly in public areas so that the
15  public wouldn't be offended by them.
16      Q    Take a look at Exhibit 1 if you would, Mr.
17  Peyton, which is the April 5th, 2000, Electronic
18  Communication Policy Amendment I that you signed.
19      A    Uh-huh (yes).
20      Q    And in the third paragraph it reads in
21  part, "Access to pornographic material is STRICTLY
22  PROHIBITED."
23      A    Uh-huh (yes).

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                21

1  Q    To me that's a bright line, black and
2  white.  "Access to pornographic material is STRICTLY
3  PROHIBITED."  Did you understand it that way or did you
4  understand it differently?
5  A    I understood it that way, but I thought at
6  the time I read it it's a gray area.
7  Q    Well, in what way did you think that was a
8  gray area?
9  A    Pornographic is not an easily definable
10  term.
11  MR. PRICE:    Let's mark that Exhibit 6.
12  (WHEREUPON, an E-mail Log was
13  marked as Deposition Exhibit No.
14  6 for purposes of identification
15  and a copy of which is attached
16  hereto and made a part hereof.)
17  BY MR. PRICE:
18  Q    Take a look at the last three pages of
19  Exhibit 6 or it's more than that actually.  It's one, two,
20  three, four pages of Exhibit 6, Mr. Peyton.
21  A    (Witness complies.)
22  Q    And I'll represent to you that those are
23  materials that Jeramey Wentz obtained when he accessed the

Mr. Peyton - Examination                                22

1  same websites that were shown on the attached log that you
2  had accessed.   Did you access that material?
3  A    I accessed the front page of those
4  websites.
5  Q    That's what I understand these are.
6  A    I accessed the front page of those
7  websites.
8  Q    Did you access this material?
9  A    Yes, I accessed the front page of these
10  websites.
11  Q    Now do you contend as you sit here today
12  that the information that you're holding in your hand, the
13  last four pages of this information, is not pornographic?
14  A    I think in the minds of many it is.
15  Q    That wasn't my question.  My question is do
16  you contend that that information is not pornographic?
17  A    You want my personal opinion?
18  Q    No, I want you to tell me what you contend
19  that information in this case is not pornographic.
20  MR. GLAZER:    And just note my objection to the
21  form.  Go ahead.
22  THE WITNESS:    Let's say by general standards it
23  would be.

Mr. Peyton - Examination                                23

1  MR. PRICE:    My question is in this case do
2  you contend that information is not pornographic?
3  MR. GLAZER:    I think he's answered the
4  question.
5  MR. PRICE:    He's not answered the question.
6  If he had, I wouldn't be asking it again, Hoyt.
7  THE WITNESS:    Do I contend that it's not
8  pornographic?
9  BY MR. PRICE:
10  Q    Yes.
11  A    I do not contend that it's not
12  pornographic, but I may not contend that it is
13  pornographic.
14  Q    Why did you access that material?
15  A    I was -- one of the five columns I wrote
16  every week for The Herald-Dispatch was a column that I also
17  sent to the Chicago Tribune.  It was an internet column and
18  it is about internet topics.
19  These columns I worked -- because they're
20  not time sensitive, these columns are not time sensitive, I
21  work on these columns far in advance sometimes.  I had some
22  downtime during this particular period and I thought, well,
23  let me go in and see what I can do about learning more

Mr. Peyton - Examination                                24

1  about the process of page jacking and mousetrapping, which
2  was a process on the internet where you go to one website
3  and before you can get out of that website, another screen
4  pops up, another -- well, yeah, there's a pop-up or another
5  screen appears to show you something else and you find it
6  very difficult to get out of.
7  It was a very hot topic at that time, still
8  is, but it was very hot at the time; and a lot of people
9  were concerned about it because more and more of this was
10  appearing in e-mails, spammed e-mails sent to people.
11  You would receive an e-mail with a website
12  located on it.  You would click on that website and up
13  would pop something, and you try to close it out and when
14  you closed that out, another one would pop up.  This
15  happened particularly with sites that maybe children
16  shouldn't be in or allowed to go to.
17  So I was working on this.  I was working on
18  that column.
19  Q    So you were working on a column that --
20  A    I was gathering -- let me put it this way.
21  I was gathering basic information for a column which I
22  planned on writing.
23  Q    So you were gathering information by

Mr. Peyton - Examination                          25

1 hitting sites that you knew would be a violation of the
2 electronic communication --
3     A    No.
4     Q    Let me finish the question, please.  --
5 that you knew would be a violation of the electronic
6 communications policy?
7     A    No.
8     Q    Why not?
9     A    Because to my way of thinking pursuing a
10 column -- my pursuing a column overrode that policy.
11    Q    So it's your contention in this case that
12 if you were pursuing a column, you didn't have to pay any
13 attention to the policy; just overrode the policy?
14    A    Basically.  Oddly enough it never even
15 crossed my mind that I was violating a policy at the time.
16    Q    Well --
17    A    Because I was in pursuit of a column or a
18 story.
19    Q    Okay, when you met with Mr. Casto and Ms.
20 Smiley and they inquired, why didn't you just tell them
21 that?
22    A    I think there were two reasons.
23    Q    And what are they?

Mr. Peyton - Examination                          26

1     A    First of all, I was in such shock that I
2 couldn't think of anything.  Second of all, they didn't ask
3 me.
4     Q    Nobody in that meeting asked you if you had
5 an explanation?
6     A    (Witness nods negatively.)
7     Q    It's your testimony that during that
8 meeting no one asked you if you had any explanation for why
9 you would access those sites?
10    A    That's correct.
11    Q    And you were in such shock that you didn't
12 think to offer that explanation?
13    A    After you had worked for a company for 32
14 years and somebody calls you in and in a matter of 30
15 seconds says, "You're fired," I think that I was entitled
16 to shock.
17    Q    Why didn't you before you accessed these
18 sites go to Mr. Casto and tell him you were going to do it?
19    A    I never did that on any kind of a column or
20 story that I did.  Never been asked to.
21    Q    Did you realize as you were accessing those
22 sites, that it would be a violation of the policy?
23    A    Never crossed my mind.

Mr. Peyton - Examination                          27

1     Q    Never crossed your mind?
2     A    Never crossed my mind.  It just never
3 crossed my mind.  I mean I never thought about it.
4     Q    Are there sites, other than these, Mr.
5 Peyton, that you accessed in your alleged investigation of
6 this mousetrapping or page jacking?
7     A    Uh-huh (yes).
8     Q    What were they?
9     A    Can't remember.
10    Q    Any clue?
11    A    No.
12    Q    Were they pornographic sites or were they
13 other sites?
14    A    There was a variety of them but since most
15 of this page jacking and mousetrapping appears on these
16 type of sites, I suspect most of them were these kind of
17 sites.  I don't recall.  I mean I wasn't looking at them
18 for content.  I was looking at them to see what would
19 happen when I got there.
20    Q    Now the first time you made any mention of
21 page jacking was on the 20th of June; do you recall that?
22    A    Uh-huh (yes).
23    Q    Why the gap?

Mr. Peyton - Examination                          28

1     A    Once again two reasons.  First of all, it
2 is kind of an unspoken habit of columnists not to reveal
3 their columns until either they are published or nearly
4 published.
5     Q    Let me stop you there.  When was your
6 column on mousetrapping or page jacking published?
7     A    I can't remember the exact date.  It was in
8 the Chicago Tribune.
9     Q    Well, give me a rough estimate?
10    A    In late June, early July.  Actually what I
11 would generally do is I would turn it into them and they
12 would publish it maybe the following week, but at the same
13 time I turned it in to them, I would turn it in to The
14 Herald-Dispatch, and often it got in The Herald-Dispatch
15 before it got in the Tribune.
16    Q    I interrupted you, I'm sorry.  You were
17 answering.  There were two answers you said for the gap.
18    A    That plus the fact that, like I say, you
19 don't disclose what you're writing about and second of all,
20 these columns were planned well in advance of when they
21 were written.
22    Q    How far in advance was this particular
23 column on page jacking planned?

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                          29

1      A    I was just getting started doing some

2    research.

3      Q    Well, at what point were you just getting

4    started doing the research?

5      A    I had talked to my, you know -- my wife had

6    mentioned it about how she -- more and more of her e-mails

7    had been page jacked. Probably a day or two before.

8      Q    A day or two before what?

9      A    Day or two before I accessed those sites in

10   question, and so I was just getting started. I wanted to

11   see how widespread it was, and as I recall -- here again, I

12   can't be specific about this, but I believe I probably got

13   some of these sites that I had off of Google, which is a

14   search engine; that's what lead me to them.

15     Q    In the column that was eventually

16   published, did you identify any particular sites that you

17   had accessed that page jacked or mousetrapped?

18     A    Did not.

19     Q    Did you keep a list of those at all?

20     A    No. I was looking for the techniques. I

21   wasn't interested in specific sites. You know, you could

22   fill up an encyclopedia with the number of sites that page

23   jacked you, so my column was aimed at pointing out the

Mr. Peyton - Examination                          30

1    problem and possible solutions to it if one of my readers

2    or one of my readers' children got in the situation.

3      Q    What about the sites that you accessed with

4    The Herald-Dispatch computers, did those page jack or

5    mousetrap you?

6      A    You know, I can't recall. I know over the

7    period of -- well, you've got to understand that after I

8    was terminated, there was a lull in there when I didn't

9    pursue that column again for a while, because --

10     Q    Well, it couldn't have been too much of a

11   lull.

12     A    No, but I mean I had to catch my breath for

13   two or three days, but I recall -- I can't recall whether I

14   was page jacked or mousetrapped in those sites or in

15   subsequent sites that I did from home.

16     Q    Do you recall saying I intentionally

17   allowed myself to be page jacked and mousetrapped many

18   times over a period of three to four days. I obviously

19   accessed a site that they, meaning The Herald-Dispatch,

20   considered pornographic?

21     A    Yeah. I can't remember in what context.

22   Was that one of the --

23     Q    How about when you were talking to the

Mr. Peyton - Examination                          31

1    Associated Press?

2      A    All right.

3      Q    So tell me about that. How many times were

4    you mousetrapped and page jacked over those three or four

5    days when you were accessing sites with the HHD computers?

6      A    Probably -- with The Herald-Dispatch?

7      Q    Yes. I understand that's what your quote

8    refers there; is that correct?

9      A    Read the quote to me again, please.

10     Q    "'I intentionally allowed myself to be page

11   jacked and mousetrapped many times over a period of three

12   to four days,' Peyton said. I obviously accessed a site

13   that they considered pornographic."

14     A    I can't recall whether I was talking about

15   those three or four days at the newspaper or the total of

16   three or four days of intermittent testing the internet for

17   page jacking and mousetrapping.

18     Q    Well, were you intermittently testing the

19   internet for mousetrapping and page jacking from home as

20   well as from the HHD computers?

21     A    Certainly afterwards.

22     Q    When I hear that quote to be saying is that

23   you were fired because you accessed pornographic websites

Mr. Peyton - Examination                          32

1    in an effort to research an article about mousetrapping and

2    page jacking and using The Huntington Herald-Dispatch

3    computers, you allowed yourself to be mousetrapped and page

4    jacket many times over three to four days.

5           Is that an incorrect assessment on my part

6    or not, because that's what the article says.

7      A    I may have -- what I may have been talking

8    there is the sum total of my research.

9      Q    Well, you would know what you were talking

10   about. I would not. That's the quote from the article and

11   I'm asking you whether or not, in fact, that --

12     A    I think probably what was meant there in

13   talking to them was the three or four days, that we're

14   talking about, is three or four days both at the newspaper

15   and at home, because the fact is this indicates that I only

16   accessed what the newspaper considered pornographic sites

17   on two days.

18     Q    Well, you're the one that knows. I don't.

19   That's why I'm asking you the question.

20     A    I think the three or four days is talking

21   about the sum total of my attempts.

22     Q    So that I'm clear, it's your testimony that

23   over a period of three or four days sometime June 11, June

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                33

1   12, that period, prior to your discharge, you had accessed
2   websites using both The Huntington Herald-Dispatch computer
3   and your home computer in an effort to develop information
4   about mousetrapping or page jacking -- I'd call it research
5   -- so that you could write an article?
6       A    I don't recall.  In the normal -- I had
7   been page jacked and mousetrapped on my home computer
8   before, but I had not done it as research.
9       Q    Well, this article, you're quoting that
10  article, seems to demonstrate an intent to go to websites
11  --
12      A    Yes.
13      Q    -- and intentionally allow yourself to be
14  mousetrapped and page jacked?
15      A    Absolutely.
16      Q    So that's research; am I correct on that?
17      A    That's correct.  I was looking, right.
18      Q    And my question is, is it your contention
19  and your testimony that you did that research over a period
20  of three or four days sometime around June 11 and June 12?
21      A    Yes.
22      Q    And it's also your contention that you did
23  that research using The Huntington Herald-Dispatch computer

Mr. Peyton - Examination                                34

1   and your home computer?
2       A    That's correct.
3       MR. PRICE:    All right.  Let's take a break
4   for a second.
5                   (WHEREUPON, a recess was taken,
6                   after which the proceedings
7                   continued as follows:)
8       BY MR. PRICE:
9       Q    Mr. Peyton, in the course of your research
10  on mousetrapping and page jacking, did you come across
11  sites which were not sexually explicit which page jacked or
12  mousetrapped you?
13      A    No, not specifically.  I ran across sites
14  where there would be very large sometimes disturbing pop-up
15  ads, which are different from --
16      Q    Uh-huh (yes).
17      A    -- but not that I recall and that's one of
18  the things that I was testing.  I was trying to see if
19  there were -- if I can find any sites other than those
20  which wouldn't be recommended for children, where page
21  jacking and mousetrapping took place; as I recall, I didn't
22  find any.
23      Q    When you say sites that wouldn't be

Mr. Peyton - Examination                                35

1   recommended for children, just generally describe for me
2   the types of sites that you're talking about?
3       A    Well, we're talking about sites that are
4   tantalizing.
5       Q    Sexually explicit sites.  How about sites,
6   for instance, related to gambling?
7       A    I think I tested those and didn't find any
8   that page jacked you.
9       Q    You say I think, and I understand that it's
10  been some time, but do you recall specifically whether you
11  tested, for instance, any gambling sites?
12      A    I'm pretty sure I tested for gambling
13  sites.  I tested some -- I tested all kinds of sites.
14  Everything from, you know, I mean in the course of -- in
15  addition to specifically spending time, say okay, I'm going
16  to test for this right now.  I was always on the lookout in
17  my surfing the internet for page jacking and mousetrapping.
18      Q    If you could estimate it for me, can you
19  tell me generally how many sites you actually tested for
20  mousetrapping and page jacking?  Any estimate at all?
21      A    (Witness nods negatively.)
22      Q    In your work as a journalist, if in
23  researching or writing a particular story, your activities

Mr. Peyton - Examination                                36

1   would violate the law, would you still do it?
2       A    You're talking about violating the federal
3   or state law?
4       Q    Yes.
5       A    No.
6       Q    Why not?
7       A    Because I believe -- it's my belief that
8   stories and columns can be investigated and written without
9   violating the law.
10      Q    Can stories be investigated and written
11  without violating the electronic communications policy?
12      A    Not the column that I wanted to write.
13      Q    So in order to write that column you
14  believed you had to violate the policy?
15      A    Didn't even think about it.  You have -- I
16  know you have information there about two other occasions
17  where I probably visited real rather than virtual sites
18  which could be considered pornographic.  One of them being
19  a strip bar and the other one being a dirty book store.
20      Q    You didn't have to use the computer to do
21  that, though, did you?
22      A    No, and I'm not even sure there was a
23  policy at the newspaper at the time that said, "On company

**Peyton vs. Herald-Dispatch Docket No. EAD-165-02 David Peyton on 5-5-03**

Mr. Peyton - Examination                    37

1 time, you can't visit a strip bar or a dirty book."

2     Q   Is there one now?

3     A   Not that I know of.

4     Q   So there wasn't any policy that would

5 prohibit that, was there?

6     A   No, but it didn't cross my mind, you see.

7     Q   I see. Tell me about the meeting that you

8 had with Mr. Casto and Ms. Smiley at the time you were

9 terminated?

10     A   Where do you want me to start?

11     Q   Wherever you want.

12     A   What I remember the most was it was in the

13 afternoon and Mr. Casto came over to my desk and said, "I

14 need to see you," and when he said that, I immediately got

15 up and I saw the look on his face; and he said, "We've got

16 to go down to Mary Smiley's office." And all the way down

17 there, he was muttering, "This is bad. This is really bad.

18 This is the worst." And I thought okay. I didn't know

19 whether they were going to tell me that my wife or son had

20 died or whatever, but then about halfway down there, uh-oh,

21 I'm in trouble.

22     So when we got in there and shut the door,

23 the thing that I remember -- I just remember bits and

Mr. Peyton - Examination                    38

1 pieces of it you got to understand. Mary began by saying,

2 "I really hate this. I hate this." And then she told me

3 -- she said, "As you know, from time to time," was and I

4 remember those words exactly -- "we monitor the activities

5 of employees on the internet." Then I can't remember the

6 exact words but then she handed me -- it looked like this

7 and she said, "You have been accessing pornographic sites

8 which is against company policy and we are going to give

9 you the option of resigning or if you don't resign, we will

10 fire you."

11     And I sat there stunned a little bit and I

12 think the first thing I said was, "Oh, my God, what about

13 my retirement?" She said, "You're fully vested. You will

14 get your retirement." And I can't remember exactly what

15 else I said, but I'm positive that she didn't ask me why

16 and my response was I'm curious.

17     Q   And when you say that, you sat through Ms.

18 Smiley's deposition and heard her testify that you were

19 asked why you had accessed those sites and your response

20 was you were curious?

21     A   Uh-huh (yes).

22     Q   And your testimony is you're positive she

23 didn't ask that and you're positive you didn't respond

Mr. Peyton - Examination                    39

1 that?

2     A   I can't recall and I believe that if they

3 had asked me -- if she had asked me for my reason, I would

4 remember that. I don't recall it.

5     Q   Well, I want to be sure that we're clear on

6 this, Mr. Peyton. Are you saying that she did not ask you

7 for an explanation or are you saying --

8     A   I don't believe she --

9     Q   Let me finish the question, please.

10     A   Sorry.

11     Q   Or are you saying that you don't recall her

12 asking?

13     A   I believe that if she had asked me for an

14 explanation, I would remember that and I don't remember her

15 asking me for an explanation.

16     Q   And you don't remember responding that it

17 was because you were curious?

18     A   No.

19     Q   But it's certainly fair to say that you

20 didn't offer any substantive explanation to Mr. Casto and

21 Ms. Smiley as to why you accessed these sites other than

22 perhaps you were curious?

23     A   I offered no explanation because I wasn't

Mr. Peyton - Examination                    40

1 asked for one. The finality in Mary Smiley's voice

2 indicated to me that she didn't want an explanation; that

3 the company's mind was made up, that I was to be

4 terminated, because I remember her distinctly saying -- she

5 didn't say, "You better give us a good explanation or you

6 are terminated." Her response was, "You'll be terminated

7 unless you resign."

8     Q   Well, again, what you just said leads me to

9 conclude that you're going to testify at the hearing in

10 this case that you were never asked for an explanation. My

11 question is were you asked for an explanation or do you not

12 recall being asked for that?

13     A   I was not asked for an explanation.

14     Q   Okay, so now your testimony is you were not

15 asked for an explanation, period?

16     A   I don't remember being asked for an

17 explanation.

18     Q   That's different than I wasn't asked. If

19 you were not asked --

20     A   I was not asked for an explanation. I

21 believe that that would have been such an important moment

22 in that particular meeting, that I would remember it. So I

23 was not asked for an explanation.

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                      41

1  Q  Okay.  So it will be your testimony at the
2  hearing of this case that you were not asked for an
3  explanation?
4  A  (Witness nods affirmatively.)
5  Q  And it will also be your testimony at the
6  hearing in this case that you did not respond with the
7  explanation that it was because you were curious?
8  A  That's correct.
9  Q  What else do you recall about the meeting
10  with Ms. Smiley?
11  A  I recall, like I say, asking about my
12  retirement and then I also recall, I think, her saying that
13  I think we may -- well, I think that was the time that
14  plans were made for my returning there on Saturday to
15  retrieve all of my information, because it was clear that
16  Ms. Smiley and other people at the newspaper wanted me out
17  of that office immediately.
18  Q  What did they tell you?
19  A  They told me that I would have to leave the
20  office, and I think that it was at that point that Ms.
21  Smiley said that we'll make plans later for you to come in
22  to retrieve your personal effects in your work station.
23  Q  And did you ultimately do that?

Mr. Peyton - Examination                                      42

1  A  Yes.
2  Q  When did you come in?
3  A  I think I came in the following Saturday
4  and Mrs. Smiley was there to watch me and my wife and my
5  son as we packed up, and after the meeting was over with,
6  and I do recall this, after the meeting was over with,
7  obviously, Mr. Casto was told to watch me like a hawk,
8  because he followed me up to the office so at least I could
9  get a couple of things that I needed, my briefcase maybe
10  and a few other items, and then I walked out the door and
11  Mr. Casto followed me out the door, and I walked down the
12  steps.  Mr. Casto followed me down the steps and I opened
13  the front door and he watched me till I left.
14  Q  Did you have any conversation with Mr.
15  Casto from the time you left Ms. Smiley's office till the
16  time you left?
17  A  Once again, I can't recall.  I think we
18  probably had some talk and I said something to him as I
19  went out the door.  I turned around and said something to
20  him, but I can't remember what it was.
21  Q  Did you have any conversation with Ms.
22  Smiley other than what you have reflected on here in the
23  last few minutes?

Mr. Peyton - Examination                                      43

1  A  The following morning.
2  Q  And what was that conversation?
3  A  She called me very early the next morning
4  and she said, like this was very early, 8:30, nine o'clock.
5  She said, "I have told Gannett that I will tell them
6  whether you resign or whether you're going to be fired by
7  ten o'clock today."  And I said, "Mary, that's not very
8  much time to make the decision."  And she said, "Yes, but
9  you must make the decision by then."  I said, "Okay."  I
10  said, "I'll get to you one way or the other by ten
11  o'clock."
12  So as quick as I possibly could, I called
13  the only attorney I knew in town who I really trusted and
14  asked her for some advice.  Do you want me to say what it
15  was?
16  MR. GLAZER:  Well, let me --
17  MR. PRICE:  If he wants to say what it was.
18  MR. GLAZER:  Well, it was not me, but I don't
19  think you need to tell them.
20  THE WITNESS:  The upshot of it was that shortly
21  before ten o'clock as I recall, I sent an e-mail to Ms.
22  Hurst and I sent a carbon copy of it to Mary Smiley saying
23  that I resigned.

Mr. Peyton - Examination                                      44

1  BY MR. PRICE:
2  Q  Other than the e-mail to Ms. Smiley and the
3  conversation you'd had with her that morning, had you had
4  any other conversations with her outside of the meeting in
5  which you were confronted with all this?
6  A  (Witness nods negatively.)
7  Q  You discussed with someone from the
8  Associated Press your termination?
9  A  Uh-huh (yes).  I actually discussed my
10  termination with more than that.
11  Q  Well, that's what I am going to ask you
12  about.
13  A  Okay.
14  Q  When do you first recall discussing your
15  termination with anyone from the Associated Press?
16  A  I don't know, two days later, three days
17  later.
18  Q  When you say two days or three days later,
19  two or three days after the meeting with Ms. Smiley?
20  A  Probably.  You see no one knew that I had
21  left.  I mean very few people knew that I had left the
22  newspaper until the following day, because it was two days
23  after I was terminated, and the story came out in the

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                45

1  newspaper that I had resigned and Ms. Hurst was wishing me
2  well; and that morning when I read it in the paper, I
3  thought, well, let's see what happens.
4          My first call was from a good friend and it
5  started like at eight o'clock in the morning and continued
6  and a good friend of mine who said, "What's going on?"  And
7  I said, "What do you mean?"  He said, "Well, you left the
8  newspaper," and said, "You resigned."  And I said, "Well, I
9  resigned because if I hadn't of resigned, I would have been
10 fired," and he said, "What's it all about?"  And I said,
11 "Well, it's just too complex to go into here," but I said,
12 "It's likely to get out because," I said, "anybody who
13 calls me, I'm going to tell them why I was terminated."
14 Why I resigned was resign or be terminated.
15         The second call was from a friend --
16     Q     Let me stop you.  I don't mean to interrupt
17 but this time I do mean to interrupt.  Who was that
18 conversation with?
19     A     The first conversation, Tom Jones.
20     Q     Who was the second conversation with?
21     A     Then it all begins to blur because I was
22 getting call after call.  Channel 3 called.  Channel 13
23 called.

Mr. Peyton - Examination                                46

1      Q     Did you do interviews with either Channel 3
2  or 13?
3      A     Absolutely.  Both of them.
4      Q     Were those interviews ultimately broadcast?
5      A     Yes, they were.
6      Q     Do you know the dates on which they were
7  broadcast?
8      A     I was terminated on what day?  June the?
9      Q     You got me.
10     A     Two days after --
11     Q     Two days after.
12     A     -- my termination.
13     Q     I'm sorry, I didn't mean to interrupt.  You
14 were recalling the phone calls?
15     A     I had visits from Channel 3 and 13.  Both
16 of them brought their TV cameras out and interviewed me.  I
17 got a call -- maybe the second call I got was from Ralph
18 Turner who is the Chairman or not a Chairman but a
19 Professor of Journalism at Marshall University, a good
20 friend of mine, but after that I mean just call after call
21 from people, and I'm not sure whether the Associated Press
22 called that day or whether it was the next day.  I also got
23 a call from the Daily Mail and I think the Daily Mail did a

Mr. Peyton - Examination                                47

1  story.
2      Q     Now you have your own website, do you not?
3      A     Yes, I do.
4      Q     It's called Peyton Place?
5      A     Well, yes, but the e-mail is
6  www.davepeyton.com.
7      Q     Do you keep a record of what you post on
8  that website?
9      A     The record is what you see.
10     Q     Do you delete material off of it at some
11 point?
12     A     Some material I delete.  Material relating
13 to this case I'm not sure that I have deleted anything.
14     Q     Okay, then you may or may not have deleted
15 the entry that you posted on the 15th of June in which you
16 indicate -- let me see if I can get it correctly.  Said,
17 "The company I worked for has corporate rules.  I broke one
18 of them."
19     A     I may have deleted that.
20     Q     You posted that on there, though, did you
21 not?
22     A     Probably.  Because not only did I say that
23 but that's exactly my -- that's what I said to the

Mr. Peyton - Examination                                48

1  Associated Press, Gazette.
2      Q     What print journalists do you call
3  discussing your termination with?
4      A     Well, I think, if I'm not mistaken, I think
5  Martha Hodel did a story for the Associated Press.  I'm not
6  sure.
7      Q     Anyone else?
8      A     Phil Cabler of the Gazette.  I believe it
9  was Phil that I talked to and, of course, the columnist for
10 the Washington Post.
11     Q     Who was that?
12     A     His name escapes me right now.  He's also
13 on CNN.  I saw him last night.  His call was rather
14 surprising.
15     Q     When did you get his call?
16     A     Once again, I can't remember, but I think
17 it was probably -- it wasn't the day the story came out in
18 our newspaper.  I think it may have been the following day.
19     Q     Who among your circle of friends did you
20 discuss your termination with?
21     A     Both of them.
22     Q     By name who might that be?
23     A     I discussed it with, of course -- Pamela

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                          49

1  Bowen's husband Charles is a long-time friend of mine.
2  Q    Charles Bowen?
3  A    Charles Bowen.
4  Q    How does he spell that?  B-o-w-e-n?
5  A    B-o-w-e-n.  I discussed it with him.
6  Probably discussed it with Pamela.  I know I discussed it
7  with Pamela.  I discussed it with anybody who I wanted to
8  -- I mean those are the people that I sought out to tell,
9  because I wanted them to know.
10  Q    That's more the thrust of my question is
11  who you would have --
12  A    Those two are -- particularly Charlie.  I
13  was most eager to seek him out.  I may have called a
14  friend.  Well, I can't remember.  I may have called a
15  friend in California and told him because I knew he would
16  be out of the loop.  His name is Mike Wilmer.
17  Q    With Mr. Bowen how soon after your
18  termination did you seek him out?
19  A    Probably the day after.
20  Q    Do you specifically recall a conversation
21  with him or just have a general recollection of talking to
22  him?
23  A    A general recollection.

Mr. Peyton - Examination                          50

1  Q    Do you recall talking with him about your
2  termination more than once?
3  A    Oh, yes.
4  Q    Can you give me an estimate of how many
5  times you may have talked with him about your termination?
6  A    It pops up a lot still.
7  Q    How about the gentleman in California, when
8  did you seek him out?
9  A    Probably a day or two later, I mean because
10  I thought Mike really ought to know, and I think I called
11  him rather than send him an e-mail about it.
12  Q    How about Mr. Bowen, did you call him or e-
13  mail him; do you recall?
14  A    You know, if I'm not mistaken, I believe
15  that -- I believe I was terminated on a Tuesday, I'm not
16  sure, but I waited until Wednesday evening because I was
17  due at Charlie's house that night to practice.  We're a
18  member of the same musical group and we have practices.
19       If I'm not mistaken, I believe I may have
20  waited until I got to his house that night and not only
21  told him but my other friend in the band.
22  Q    Who else was in the band or is in the band?
23  A    Joe Dobbs, Sam St. Clair, I'm not sure if

Mr. Peyton - Examination                          51

1  Sam had joined us by then or not, maybe not, and Doug
2  Chaffin I think was there.
3  Q    Anyone else that you can recall?
4  A    No.  Pamela was there.
5  Q    I was going to ask that.
6  A    Pamela was there.
7  Q    Would she have heard whatever conversation
8  you had with Mr. Bowen?
9  A    Probably.
10  MR. PRICE:    Let's take another break for a
11  minute.
12       (WHEREUPON, a recess was taken,
13       after which the proceedings
14       continued as follows:)
15  BY MR. PRICE:
16  Q    Mr. Peyton, I'd like to have you, if you
17  would, think back in time and give me as complete a work
18  history for you as you can including the jobs that you've
19  held, who the employers have been.  If you can recall, who
20  your supervisors have been and the type of work that you
21  were doing?
22  A    Even prior to my association with The
23  Herald-Dispatch?

Mr. Peyton - Examination                          52

1  Q    Yes.
2  A    Prior to my being hired by The Herald-
3  Dispatch, by the Huntington Publishing Company as they were
4  called then, I had not held a full-time job.  I had two
5  summer internships with WSAZ, Channel 3, in the news
6  department.  I had worked part-time for Channel 13, called
7  WHTN at the time, I think, and I can't remember the exact
8  date that I went to work for The Herald-Dispatch or The
9  Advertiser.  I think may have gone to work for The
10  Advertiser, first of all.
11       Huntington Publishing Company had two
12  newspapers at the time, The Herald-Dispatch and The
13  Advertiser.  I may have worked for The Advertiser at first
14  during the summer probably '65, '64, '65 as an intern, a
15  paid intern.
16       I can't remember the exact date that I was
17  hired, but I was hired full time then by The Advertiser
18  under -- my immediate supervisor at the time was the city
19  editor whose name was C.T. Mitchell.
20       Mr. Mitchell was also the editor of -- was
21  also the city editor for the Sunday newspaper which was
22  called The Herald Advertiser, which was a combined pretty
23  much like the Gazette-Mail, except, you know, it was a JOA.

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                    53

1 The newspapers were both owned by the Huntington Publishing
2 Company. C.T. was my immediate supervisor then who I
3 worked for The Advertiser and on Saturdays for the Sunday
4 newspaper.
5         Along about the time that Gannett, or we
6 were purchased first by a gentleman named Chin Ho who was
7 the owner of the Honolulu Advertiser and maybe a couple of
8 other newspapers, purchased from the two ladies who owned
9 the Huntington newspaper.
10        Hilda Long and Helen Burke sold the
11 operation to Chin Ho, and he in turn sold to Gannett,
12 property and other properties that he owned to Gannett I
13 believe in 1972, if I'm not mistaken.
14    Q    What was your position when that occurred?
15    A    I was still reporting, and in 1972 I
16 believe it was I may have been -- I can't remember but if I
17 wasn't working for the -- no, I was still working for The
18 Advertiser at that time when Gannett officially took over,
19 but I was doing reporting.
20        The first representative of Gannett at the
21 Huntington newspaper was N.S. "Buddy" Hayden who was the
22 first Gannett publisher. He just died recently as a matter
23 of fact, but he was the one -- well, he was on a tirade.

Mr. Peyton - Examination                                    54

1 Buddy Hayden was out to get rid of the vestige of the old
2 family-owned newspaper and I don't know if he forced people
3 out or whether they just left out of disgust that this
4 giant conglomerate had taken them over, but we had a lot of
5 people retire.
6         The editor-in-chief of both newspapers
7 whose name was Raymond Brewster retired and in time the
8 editorial page editor of The Advertiser retired. His name
9 was Wendell Reynolds and Mr. Hayden was in the process of
10 changing, dramatically changing the look and the feel of
11 The Huntington Advertiser and out of the clear blue asked
12 me to be editorial page editor.
13        So as I recall, I went directly from being
14 a reporter for The Advertiser to editorial page editor of
15 The Advertiser replacing Mr. Reynolds who had been there
16 God knows how many years.
17    Q    What year was that roughly?
18    A    That was probably '73, maybe '74. After
19 that I was editorial page editor for a couple of years
20 until I decided to apply for the Alicia Patterson
21 Foundation Scholarship for the years -- for one year
22 beginning about mid 1975 and continued through mid 1976.
23        I applied for and received the Alicia

Mr. Peyton - Examination                                    55

1 Patterson Fellowship Foundation Scholarship at which time I
2 spent a year away from the newspaper basically studying
3 folk culture. Two in particular, the Appalachian folk
4 culture and the Cajun folk culture of southwest Louisiana.
5         The newspaper gave me the sabbatical and
6 kept me on their insurance; in other words, I had company
7 insurance but they didn't pay me. I was paid during that
8 year by the Alicia Patterson Foundation.
9         Basically what I did was write stories not
10 academic research pieces but feature stories on the culture
11 of Appalachia and Louisiana and how they were changing,
12 how they were disappearing in the face of the mass culture
13 and those type of things?
14        When I came back, I think -- and I can't
15 remember who the editor was at the time. It may have been
16 John -- I can't remember his last name. I didn't want to
17 be editorial page editor anymore. I thought it was too
18 restrictive. So I was put back to being sort of a feature
19 writer and between the years 1976 and say 1986, the next
20 ten years, basically I was a writer of features.
21        Sometimes I would have duties of writing
22 major breaking stories. Mostly I would be writing
23 features, in-depth research articles and those types of

Mr. Peyton - Examination                                    56

1 things and understand also during all this time I covered
2 almost every beat known at the newspaper at one time or
3 another. Everything from police to city hall to the
4 courts, all of that stuff.
5         There was a parade of -- when I came back,
6 I was no longer for The Advertiser as I recall. Beginning
7 in 1976 I went to The Herald-Dispatch I believe about that
8 time. I worked under publishers. Mr. Hayden left, and I
9 can't remember who the next publisher was, but one of them
10 was Don Hatfield who was a home-grown local product who had
11 worked his way up through the ranks to become publisher of
12 the newspaper.
13        I worked under several city editors. Some
14 of them -- I'm not really good at names, for remembering
15 names much more than four or five years ago, but I know
16 Gabordi was the last one that I worked under, and there was
17 Zack Binkley, I worked under him for a while and then there
18 was the one who is in Pensacola now. His name I really try
19 to forget, because he was very strange.
20    Q    How long did you work under Mr. Gabordi?
21    A    I don't how long. Gabordi was there three
22 years. I can't remember.
23    Q    So for whatever amount of time he was

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                  57

1  there?

2       A    Yeah, he came and if I'm not mistaken, he
3  was either in the process of leaving or left either before
4  or shortly after I was terminated.

5       Q    What about Mr. Casto?  Was he your
6  supervisor?

7       A    When I began writing columns in I believe
8  it was 1986, Mr. Casto was sort of my immediate supervisor.
9  I was a columnist and so it was either then or shortly
10  thereafter that he was named my immediate supervisor.

11       Q    And did he continue as your immediate
12  supervisor until you left?

13       A    Well, yes, in the respect he was the one
14  who gave me, you know, the yearly review and, you know,
15  there's a process where your immediate supervisor gives you
16  your yearly review and he gave me yearly reviews and those
17  types of things.

18       Q    How did you -- what was his role and your
19  role in working together?  Did he approve the things that
20  you were writing?

21       A    No.

22       Q    Did you give you assignments?

23       A    No.

Mr. Peyton - Examination                                  58

1       Q    How did that work?

2       A    I would walk in at the time or before the
3  time that a column was due to him and say, "Here it is,"
4  and he would 99 times out of 100 accept it and, you know.
5  He didn't assign me columns.  He didn't assign stories.  If
6  there was something special that the newspaper wanted me to
7  do, they might ask Mr. Casto to relay it to me or the
8  executive editor might call me in and say, "I want you to
9  do this."

10       Q    Was Mr. Casto the last supervisor that you
11  had with The Huntington Herald-Dispatch?

12       A    Yes.

13       Q    Since leaving The Huntington Herald-
14  Dispatch, what income have you earned and from what source?

15       A    I earn $150 a week in a work-for-hire
16  situation with the Charleston Daily Mail for writing two
17  columns a week for them.  This is, like I say, a work-for-
18  hire situation.  No benefits, you know.

19       I earn $65 a week from the Chicago Tribune
20  for writing the internet column; that again is a work-for-
21  hire situation; however that income started well before I
22  was terminated with The Herald-Dispatch.

23       I have earned small amounts of money,

Mr. Peyton - Examination                                  59

1  insignificant amounts of money, from writing other small
2  pieces for Huntingtonnews.net.  I can't remember the sum
3  total but it's not very much, and I am also in the process
4  -- I also have some web pages that I'm selling.  I'm
5  developing web pages for certain organizations and that's
6  just getting started.

7       Q    Are you compensated for that work?

8       A    Yes.

9       Q    Do you do that as an independent
10  contractor?  Do that on your own?

11       A    Yes.

12       Q    As far as the income you receive, how is
13  the income --

14       A    Oh, the other income that I get is I get a
15  little over $800 a month in retirement from Gannett.

16       Q    Okay.  In terms of the income that you
17  received from these other resources, I assume that's
18  documented through W-2s or 1099s forms or whatever?

19       A    Uh-huh (yes).

20       Q    How about the income that you receive from
21  the development or creation of the web pages?

22       A    No.

23       Q    How is that --

Mr. Peyton - Examination                                  60

1       A    We haven't got -- I haven't got far enough
2  along with those to receive any 1099s or -- yeah, they
3  would be 1099s is what they would send me.

4       Q    Do you do that under a business name of
5  some sort or just do it on your own?

6       A    No, they pay me.

7       Q    Since leaving The Huntington Herald-
8  Dispatch, have you applied for work anywhere?

9       A    No.

10       Q    Did you sign up for unemployment at all?

11       A    Yes.

12       Q    And when did you sign up, right after?

13       A    Right after, shortly thereafter.  By the
14  way, to retrace my steps, that was the other question I
15  remember asking Mary Smiley in that meeting.  I asked her
16  am I eligible for unemployment and she said, "No, you're
17  not eligible for unemployment because you were fired."
18  "Because, you know, of the circumstances under which you
19  were terminated."  So I thought, well, we'll see about
20  that.

21       Q    When did you ask her that; did you ask her
22  that during the initial meeting?

23       A    Uh-huh (yes).

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                              61

1    Q    Or some point afterwards?

2    A    At the initial meeting I think.  The

3 initial meeting.

4    Q    Let me ask you about that initial meeting.

5 As I understand it, you went in and what did she say to you

6 at that point?

7    A    Well, I remember she began by saying, "I

8 just hate this.  I just hate this," and then she mentioned,

9 "You know from time to time we," and I remember that word

10 exactly, "from time to time we monitor employees accessing

11 the internet to see what they're accessing," and I can't

12 remember.  I have to paraphrase what she said.

13    Q    Sure.

14    A    "We monitored you and we found out that you

15 accessed some pornographic sites which is a violation of

16 company policy."

17    Q    Did you know what she was talking about at

18 that point?

19    A    Yeah.

20    Q    So the conversation that you had about the

21 unemployment issue was during that same conversation --

22    A    I actually just in passing, I said, "Am I

23 eligible for unemployment?"  She said, "No, you're not."

Mr. Peyton - Examination                              62

1    Q    Okay.  Now you talked with her again I

2 think you said the following morning?

3    A    Yes.

4    Q    When you talked with her the following

5 morning, why didn't you offer any explanation to her then?

6    A    She didn't ask.

7    Q    But you didn't think to offer one even

8 though you were --

9    A    Too late.  I mean her response was, "I need

10 to know by ten o'clock, because if you don't resign, we're

11 going to fire you."

12    Q    So you --

13    A    There's a finality there that I don't think

14 one needs to --

15    Q    You didn't even attempt to offer her any

16 explanation?

17    A    I thought at the time it was a little too

18 late for falling down on your knees and begging.

19    Q    Well, I didn't characterize it as falling

20 on your knees and begging.  I asked if you asked -- if you

21 offered her an explanation and your answer is no?

22    A    There was a finality to the whole scenario.

23    Q    Your answer then is no?

Mr. Peyton - Examination                              63

1    A    No.

2    Q    When you went down and applied for

3 unemployment compensation benefits, did they require you to

4 certify that you were seeking work?

5    A    Yes.

6    Q    Did you seek work?

7    A    I went one time to the -- to begin the

8 process, but I only received one week's worth of

9 unemployment because shortly thereafter I started making

10 too much money to get unemployment.  When I found out that

11 my retirement was going to be $800 or thereabouts a month,

12 and when you added that to the money that I was getting

13 from Chicago Tribune --

14    Q    Sure.

15    A    -- then once I got my retirement, that

16 nullified my inability to get -- my ability to get

17 unemployment.

18    Q    So that I'm clear, you made at least on one

19 occasion, you went down to the Division of Employment

20 Security and did whatever you needed to do to apply?

21    A    It was just kind of signing up.

22    Q    Right.

23    A    They didn't tell me, "Here's where you need

Mr. Peyton - Examination                              64

1 to go look for a job," and this kind of thing.

2    Q    Right.  Okay, now, since you signed up for

3 unemployment compensation, did you apply for work anywhere?

4    A    No.

5    Q    And you didn't have any unsolicited offers

6 of employment coming in?

7    A    Yeah, eventually.

8    Q    Okay, what did you have come in?

9    A    The Daily Mail on or about the 1st of,

10 what, July or August or thereabouts, I received a call from

11 the managing editor there saying, you know, "We'd like to

12 have you come up and talk about writing columns for us."

13    Q    And you did and established a relationship

14 with them, I assume?

15    A    Yeah.  Oddly enough, the same day that I

16 went up there and was accepted or I accepted their offer of

17 writing columns for them, when I got back, there was a

18 message waiting for me from Mr. Selby of the Gazette, and I

19 called him and he said, "We'd like to have you write

20 columns for the Gazette."  I said, "You're too late."

21         So I don't know whether they're on the same

22 wave length in that office or what, but I turned down an

23 offer from the Gazette to write columns for them because I

**SCRUNCH™**                                              **Pages 61 - 6**
Nancy McNealy, CCR, 304-988-2873                            1

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                                65

1  had already committed myself to the Daily Mail.

2      Q    Okay.  Other than the offer from the Daily

3  Mail and the offer from the Gazette, did you have any other

4  offers of employment?

5      A    No.

6      Q    What disabilities do you claim to suffer

7  from, Mr. Peyton?

8      A    I had a hip problem which was probably

9  congenital that required two operations at the age of 14,

10 which left me an osteoarthritic condition in my hip joint,

11 which basically leaves my hip joint completely frozen.

12     Q    And you had that since you were 14?

13     A    Uh-huh (yes).  I also suffer from diabetes.

14 I also have hypertension and I've had an operation for

15 prostatectomy as a result of prostate cancer.

16     Q    Has the prostatectomy been successful?

17     A    Yes, so far.

18     Q    Are you under treatment for the

19 hypertension?

20     A    Yes.

21     Q    Is that controlled?

22     A    Yes.

23     Q    Did any of those conditions at any point,

---

Mr. Peyton - Examination                                66

1  the remaining condition, that is your problem with your hip

2  or your diabetes, prevent you from performing the duties

3  that you had at The Huntington Herald-Dispatch?

4      A    No.  However -- no, not the duties that I

5  had.

6      Q    Well, you hesitated there.

7      A    Well, what I'm saying is that whether by

8  chance or whether by design, the last ten years of my work,

9  not ten years, the last -- from 1986 to -- well, yeah,

10 longer than that -- for the last 14 years, 13 years, I was

11 a columnist and that doesn't require a lot of physical

12 stamina.

13     Q    Sure.

14     A    I don't have to go out on a beat and chase

15 ambulances or police cars.  I don't have to go -- you know,

16 there weren't any disasters that I covered.

17          Now, when I was younger and the hip gets

18 progressively worse as you get older.

19     Q    Sure.

20     A    When I was younger, I had no problem with

21 that.  I was at Buffalo Creek, the disaster.  I walked

22 around for two or three days at the Marshall plane crash,

23 and I walked through mud and muck at the Silver Bridge, but

---

Mr. Peyton - Examination                                67

1  that's when I was much younger; but the fact is a disaster

2  like that had happened say from 1986 on, which 1986 was

3  when I was in the hospital and subsequently at home with

4  osteomyelitis of that hip joint, after that if somebody had

5  asked me to go climbing on a mountain in search of a plane

6  wreck or going up Buffalo Creek or going up, you know, a

7  slide dam or something, I couldn't have down that.

8      Q    Sure.  In terms of your job as a columnist,

9  did you request that position or were you assigned to it?

10     A    I was assigned to it, more or less.  Here

11 again, names elude me.  We had a publisher at the time --

12 anyway he wanted me to write a column and he said, "I think

13 you would be great at writing a column," and so he more or

14 less directed whoever the editor was at the time that I

15 should be a columnist for the newspaper.

16     Q    Did you have any objection to that?

17     A    No.

18     Q    I was going to say it would sound like a

19 pretty good move?

20     A    None whatsoever.

21     Q    Has there ever been any instance in which

22 while you were working for The Herald-Dispatch there was

23 some assignment which was given to you that you could not

---

Mr. Peyton - Examination                                68

1  perform because of either your hip or some other condition?

2      A    Huh-uh (no).

3      Q    Tell me what evidence you have in this case

4  that your termination was the result of either a disability

5  or a perception that you're disabled?

6      A    Evidence?

7      Q    Yes.

8      A    I have no hard fast evidence.

9      Q    Then why do you make that allegation?

10     A    Because I believe -- well, I believe that

11 when you add up my disabilities and my age, being 57 at the

12 time I was terminated plus the disabilities, I was very a

13 bad risk for that newspaper and besides that, I was being

14 paid more money than the average staffer down.

15          You've got to understand also for a

16 newspaper the size of The Herald-Dispatch for it to have a

17 columnist is a rarity.  Columnists are usually just pure

18 columnists who are on staff and on, you know, in other

19 words, they're hired full time are a rarity among

20 newspapers that size.  So I was an anomaly.

21     Q    Well, when you say --

22     A    A rather high-paid anomaly.

23     Q    When you say you were -- I think your words

---

**SCRUNCH™**
**Nancy McNealy, CCR, 304-988-2873**

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                    69

1  you were a risk or you were a high risk --
2      A    Oh, yeah.
3      Q    -- what do you mean by that and how does
4  that support your claims in this case?
5      A    I think that -- as I understand it, Gannett
6  is self-insured and those kind of things.  I think I was --
7  if you look at my past and my current situation, medical
8  situation, I was due to cost a lot of money between the
9  time 57 and the time I was 65.
10      Q    Was that the time you anticipated retiring
11  was 65 that way -- *would*
12      A    Well, I probably wouldn't have retired by
13  then.  Yeah, I suppose.  I don't know.
14      Q    I'm trying to understand the linkage there.
15  I mean is it your contention in this case that because The
16  Herald-Dispatch believed medical costs associated with you
17  as an employee would be higher than with other employees,
18  that that was the reason that they discharged you?
19      A    I think that's part of the reason, uh-huh.
20  The other part of the reason is that if I remained there
21  until I was 65, my retirement would have been considerably
22  more.  I'm not privy to information about how much more it
23  would be, but I've heard through the grapevine that my --

Mr. Peyton - Examination                    70

1  if I had stayed there until I was 65, my monthly retirement
2  check would have been almost twice as much as it is now.
3      Q    Is it your contention in this case that
4  your discharge was motivated either in part or in totality
5  by a desire on the part of The Huntington Herald-Dispatch
6  to discriminate against you because of your pension?
7      A    In part.
8      MR. PRICE:     Let me take a quick break for a
9  minute.
10              (WHEREUPON, a recess was taken,
11              after which the proceedings
12              continued as follows:)
13      BY MR. PRICE:
14      Q    Mr. Peyton, let me turn back to your hip
15  condition and your diabetes.
16      A    Uh-huh (yes).
17      Q    At the time of your termination had you
18  been told by any of your physicians that either of those
19  conditions was progressing to the point that you'd need
20  some sort of additional aggressive, expensive treatment of
21  some kind?
22      A    I have been told by a couple of orthopedic
23  surgeons in the past that it's likely that I will have to

Mr. Peyton - Examination                    71

1  have a hip replacement in time.
2      Q    Has anybody given you any sort of a time
3  frame for that replacement?
4      A    No.  The reason is that every one of them I
5  had consulted with, including Dr. Heckman, who was my early
6  childhood orthopedic surgeon and the gentleman who treated
7  me for osteomyelitis whose name I can't remember now, but
8  he said, "Wait as long as you can."
9              Two reasons, hip joints don't last forever
10  and the longer you can wait, the longer it's going to last
11  you.  Less likely you're going to have a replacement of the
12  replacement and second of all, because of the fact that I
13  obviously had -- there's still a good possibility that I
14  have some sort of bacterial infection in the hip joint,
15  which is in kind of a hibernative state.  They say there's
16  particular danger in this operation because it could stir
17  up that particular bacteria and can cause problems.
18      Q    Had you discussed the need, for instance,
19  for a hip replacement with anybody at The Herald-Dispatch?
20      A    No.
21      Q    How about your diabetes, is there any
22  component of your diabetes that you've been told would
23  require some significant or expensive treatment in the

Mr. Peyton - Examination                    72

1  future?
2      A    I have read and the doctors have warned me
3  that -- it wouldn't take a genius to know that diabetes
4  compromises your immune system.  You're more likely to have
5  heart attacks and strokes with diabetes.
6              You're more likely to have -- well,
7  problems with your feet and your limbs.
8      Q    When were you diagnosed with diabetes?
9      A    Probably 1997 or '98.
10      Q    Type II diabetes?
11      A    Type II.
12      Q    You're not insulin dependent?
13      A    No.
14      Q    Have you discussed your diabetes with
15  anyone at The Huntington Herald-Dispatch?
16      A    No, but -- well.
17      Q    I'm sorry?
18      A    Well, what I'm saying is I didn't discuss
19  it, but you understand that you can pretty much get a
20  medical history of me by finding out what I've been
21  through.  You know, what I charged through my health
22  insurance.
23              For instance, if I received Glucophage

**Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03**

Mr. Peyton - Examination                    73

1  which is a common diabetic medication through my health

2  insurance and charged it to Gannett health insurance,

3  there's only one reason that I would be taking Glucophage,

4  and that's because I have diabetes.

5        Q      Do you know what records of your health

6  insurance costs or expenses are kept?

7        A      No.

8        Q      When you submit a claim to your health

9  insurance, where do you submit it?

10       A      Actually at the time that I was there I

11 believe Aetna was managing for Gannett, but I'm not sure

12 who does it now.

13       Q      And when you had a claim of some sort, did

14 you submit that directly to Aetna?

15       A      If I'm not mistaken, the pharmacy did that

16 for me.

17       Q      Well, I mean --

18       A      Yes, it was submitted to Aetna, but as I

19 understood it, it wasn't Aetna who was paying.  Aetna was

20 the manager of the health insurance.

21       Q      My question is where the records of those

22 things would be located?

23       A      Oh, I have no idea.

Mr. Peyton - Examination                    74

1        Q      All right.  When you communicated with the

2  -- I think you said the Chicago Tribune, how did you do

3  that?  Did you seen them, your columns --

4        A      I sent them my columns, e-mailed from home.

5        Q      Was that your common practice; did you ever

6  send them columns that were hard copy?

7        A      No, not that I can recall.

8        Q      When did you initiate or when was the

9  relationship with the Tribune initiated?

10       A      It would have probably been about '94, '95.

11       Q      Prior to sending your article or your

12 column to the Tribune that involved mousetrapping or page

13 jacking, did you communicate with anybody at that paper

14 about that column?

15       A      Uh-huh (yes).

16       Q      With whom?

17       A      I think that I probably contacted the

18 editor who handles most of my columns who does work for the

19 Tribune media services; that's not the Chicago Tribune.

20 That is a subsidiary of the Chicago Tribune.  Her name is

21 Stacy Diebeler.

22       Q      The court reporter is going to ask.  Do you

23 know how she spells her last name?

Mr. Peyton - Examination                    75

1        A      D-i-e-b-e-l-e-r.

2        Q      And where is she located?

3        A      She's located in the main office of the

4  Tribune media downtown Chicago, which is in the Tribune

5  building.

6        MR. PRICE:      All right, that's it.

7        MR. GLAZER:     I have nothing for you, Dave.

8  Reading and signing, he'll read.  Thank you.

9             (Witness stands aside.)

10            (WHEREUPON, the deposition was concluded.)

11

76

I have read the foregoing transcript, pages

1 through 75, inclusive, which contains a correct

transcript of answers made by me to the questions therein

recorded, or as amended in the attached list of

corrections.

Date                    David Peyton

STATE OF                    ,

COUNTY OF                    , to wit:

Taken, subscribed and sworn to before me

this      day of             , 2003.

My commission expires November 26, 2010.

Notary Public

Peyton vs. Herald-Dispatch  Docket No. EAD-165-02  David Peyton on 5-5-03

77

E R R A T A   S H E E T

The following changes and/or corrections are

suggested for the deposition of DAVID PEYTON was taken on

May 5, 2003, in the matter of David Peyton vs. Huntington

Herald-Dispatch, Docket No. EAD-165-02.

Page No.   Line No.   Reference          Correction

79

I further certify that I am neither attorney or

counsel for, nor related to or employed by, any of the

parties, or a relative or employee of the attorney, or a

relative or employee or attorney of one who has a financial

interest in the outcome of the case, nor has a contractual

relationship with a party litigant to provide reporting

services, or who otherwise is financially interested in the

action.

Given under my hand this 16th day of May, 2003.

My commission expires November 26, 2010.

Seal          Certified Verbatim Court Reporter

Commissioner of West Virginia

78

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to wit:

I, NANCY MCNEALY, Certified Verbatim Court

Reporter, duly certified by the West Virginia Supreme of

Appeals, duly commissioned and qualified, and Commissioner

of the State of West Virginia, do hereby certify that the

foregoing deposition of DAVID PEYTON was duly taken by me

and before me at the time and place for the purpose

specified in the caption hereof.

I further certify that said deponent was first

duly sworn and placed under oath by me on the record; that

the said deposition was written out in full and transcribed

in  the English language under my supervision; and that

this deposition is a true record of the testimony given by

the deponent.

I further certify that the deponent requested to

read and sign the deposition testimony and an errata sheet

and signature page are hereby included in this deposition

transcript.

STATE OF WEST VIRGINIA
HUMAN RIGHTS COMMISSION

David Peyton,
      Complainant

      vs.                      Docket Number:  EAD-165-02

Huntington Herald Dispatch,
      Respondent

## ANSWER

Respondent offers the following Answers to the particulars set forth in the Complaint filed by Complainant in the above-styled case.

I.      Respondent denies the statement contained in paragraph I.  Complainant resigned his employment on July 12, 2001.

II.     Respondent denies the representations contained in paragraph II.  Complainant has not been discriminated against on any basis, including age or disability.

     A.      Respondent admits the representations contained in paragraph II (A).

     B.      Respondent admits the representations contained in paragraph II (B) with limitation.  Respondent is only aware of the health problems for which Complainant has submitted documentation to Respondent.

     C.      Respondent denies the representations contained in paragraph II (C). Complainant's resignation from the Company was the direct result of Complainant's violation of Company rules.  Complainant's age and health, salary, pension and healthcare benefits were not a factor.

     D.      Respondent admits the representations contained in paragraph II (D) with limitation.  Complainant's work record was favorable overall, but did not reach the level of excellence.  It is true that Complainant's disability did not interfere with his ability to perform the essential tasks associated with his position.

     E.      Respondent denies the representations contained in paragraph II (E). Complainant has not been subjected to any form of discrimination, based on age, disability, or for any other reason.

"D"

Wherefore, having fully answered all counts of this Complaint, the Huntington Herald Dispatch respectfully moves that this case be dismissed in its entirety.

Respectfully submitted,

William A. Behan
Director/Labor Relations and
Labor Counsel
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107-0720

## OATH

Commonwealth of Virginia
County of Fairfax

Personally appeared Mr. William A. Behan on December 3, 2001 and made oath to the truth of the matter contained in the foregoing Answer before me.

Gloria Ceci
Notary Public

Gloria Ceci
NOTARY PUBLIC
Commonwealth of Virginia
My Commission Expires 11/30/05



**GANNETT**

Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107-0720

**William A. Behan**
*Director/Labor Relations & Labor Counsel*

Office: 703.854.6636
Fax: 703.854.2029
Email: wbehan@gannett.com

December 4, 2001

Mr. William D. Mahan
Director of Field Operations
State of West Virginia Human Rights Commission
1321 Plaza East
Room 108A
Charleston, WV 25301-1400

      Re:    David Peyton v. The Huntington Herald-Dispatch
              Docket Number: EAD-165-02

Dear Mr. Mahan:

I represent the Huntington Herald-Dispatch in the above-referenced matter. This correspondence, along with the accompanying Answer and attachments, sets forth the position of the Huntington Herald-Dispatch (the "Company") in connection with the Complaint of Discrimination filed by Mr. David Peyton ("Complainant"). Complainant alleges that the Huntington Herald-Dispatch discriminated against him because of his age, 57, and disability, in violation of the West Virginia Human Rights Act, as amended. The Company denies these allegations.

The Huntington Herald-Dispatch's policy on Equal Employment Opportunity strictly prohibits discrimination based on age and/or disability. (Attachment A)

**Position Statement**

Complainant was hired by the Company in 1966 and worked as a Columnist since 1986. Complainant's tenure with the Company ended on July 12, 2001, when Complainant tendered his resignation, in lieu of being terminated.

Complainant's resignation was submitted as a result of Complainant's violation of a Company rule. Quite simply, Complainant logged numerous hours on-line visiting pornographic web sites, in direct violation of Company rules. These rules were delineated numerous times to Huntington Herald-Dispatch employees, including Complainant, and copies of the Company's electronic communications policy, as issued at various times, are attached:

- Attachment B – Electronic Information Policy issued on or about April 2000 and signed

by Complainant on April 6, 2000.
- Attachment C – Memorandum to Huntington Herald-Dispatch employees dated June 15, 2000 containing the same policy referenced in Attachment B above.
- Attachment D – February 26, 2001 and February 27, 2001 "News to Know" reiterating the e-mail and internet policies of the Huntington Herald-Dispatch.
- Attachment E – February 28, 2001 memorandum from the Publisher to Huntington Herald-Dispatch employees regarding e-mail use and electronic access.

It should be noted that the Electronic Information Policy, signed by Complainant on April 6, 2000 specifically states,

"Access to pornographic material is <u>STRICTLY PROHIBITED.</u>"
(emphasis in the original)

The Company became aware on or about June 12, 2001, that Complainant had violated the above-referenced Company rule. A list of all the web sites accessed by Complainant on June 11, 2001 and June 12, 2001 is attached; the pornographic sites are included. (The list is not limited to the pornographic sites visited by Complainant.) See Attachment F. A partial list of the relevant web sites includes:

www.sex-stories.com
www.sexaddicted.com
www.thesexnetwork.com
www.bigsextoys.com
www.horneymonkeys.com
www.powerandlove.com
www.swingclub.net
www.powerotics.com

Complainant was confronted with his violation of the rules. As a result of his number of years of service with the Company, Complainant was given the opportunity to voluntarily resign his employment in lieu of termination. He elected to do so on July 12, 2001.

Subsequent to his resignation, Complainant acknowledged that he had violated the Company's rules and policies in an on-line column that he writes. Within that column, he stated,

"I said I was offered the option of resigning or being terminated because I violated a Gannett company policy. I always added that the policy I broke…"

A copy of the relevant portion of Complainant's on-line column is attached. (Attachment G) In addition, Complainant's column included a story about the incident that ran in The Charleston Gazette. ("Columnist Resigns from Herald-Dispatch," by Phil Kabler, June 15, 2001.) In the story, Complainant is quoted as saying, "The company has a set of rules, like all companies, and I violated one of those rules." (Refer to Attachment G)

Complainant now alleges his employment was terminated due to discrimination on the basis of his age, 57, and his disabilities, necrosis of cartilage and scar tissue of hip joint, and any other disabilities, whether actual or perceived. <u>These allegations are, quite simply, false.</u> There is not one scintilla of evidence to suggest that Complainant's employment with the Company ended for any other reason than his violation of Company rules as evidenced by his repeated visits to pornographic web sites. (Refer to Attachment G)  To date, there has been one other employee of the Huntington Herald-Dispatch who committed the same rules infraction, and he was treated in exactly the same manner. E. Kent Bailey, Transient Accounting Collector, was hired January 18, 1999, and his employment was terminated February 23, 2001 for violation of the policy. Any other employees who commit the same offense will also be similarly treated.

With regard to Complainant's disability allegation, other employees who have presented serious medical ailments have not been terminated, nor was Complainant terminated for his medical ailments. A report showing the number of Huntington Herald-Dispatch employees who have gone out on short-term medical disability in the past two years is attached. (Attachment H) It should be noted that none of these employees had their employment terminated as a result of their medical leave.

While it is true that Complainant enjoyed a lengthy tenure of employment with the Company, there is no truth to his allegations that his employment was terminated as a result of his age or disability. Complainant broke a rule and he got caught. It's that simple. He admitted the same in his on-line column. (Refer to Attachment G)

Complainant has at all times been treated fairly by the Company. It is the Company's position that this Complaint of Discrimination is wholly without merit and should be dismissed in its entirety.

I believe the information provided herein thoroughly responds to this Complaint of Discrimination. If you have any questions, please do not hesitate to contact me or Cynthia Hale, Gannett Co., Inc.'s Manager/EEO & Labor Law. She can be reached at 703/854-6937.

Very truly yours,

William A. Behan

Atts.

cc:     Cynthia Hale
        Leslie Hurst
        Hoyt Glazer, Esq.

**RESPONDENT'S CERTIFICATE OF MAILING FORM**

Docket Number EAD-165-02

I hereby certify that I served a copy of the enclosed Position Statement, with accompanying attachments, and Answer, by certified U.S. Mail on the Complainant's attorney named below:

Hoyt Glazer, Esq.
Stuart Calwell, PLLC
405 Capitol Street, Suite 607 – P.O. Box 113
Charleston, WV 25321

_____
Signature

12/4/01
_____
Date

THE LAW OFFICES OF

# STUART CALWELL, PLLC

JAN 3 0 2001

405 Capitol Street
Suite 607
Post Office Box 113
Charleston, West Virginia 25321

Telephone: (304) 343-4323
FAX: (304) 344-3684
Toll Free: 1-800-876-5529
Email: stuartcalwell@calwelllaw.com

Stuart Calwell
John H. Skaggs
Mary McQuain
David H. Carriger (W.Va. & Va.)
Vincent Trivelli (W.Va. & D.C.)
Tom White
Hoyt Eric Glazer (W.Va. & La.)

January 24, 2002

Mr. William D. Mahan
Director of Field Operations
State of West Virginia Human Rights Commission
1321 Plaza East, Room 108A
Charleston, West Virginia 25301-1400

        Re: David Peyton v. The Huntington Herald-Dispatch
            Docket Number: EAD-165-02

Dear Mr. Mahan:

This firm represents Mr. Peyton, who, as you know, has alleged that the Huntington Herald-Dispatch ("Respondent") illegally terminated him based on age and disability discrimination in violation of the West Virginia Human Rights Act. We have received a copy of the Company's December 4, 2001 "Position Statement" and have reviewed the Company's response to the charges. On behalf of Mr. Peyton, we wish to respond and correct several inaccuracies in the Respondent's "Position Statement."

As you know, Mr. Peyton worked over thirty years for the Respondent as a journalist in Huntington, West Virginia. Over these decades, Mr. Peyton has written about numerous and diverse matters of human interest. In addition to the four general columns he wrote for the Huntington Herald-Dispatch, he wrote a weekly "internet" column. Mr. Peyton often spent time online at work investigating possible stories, including stories for his online column.

Before the advent of the internet, Mr. Peyton had established himself as a featured columnist and gained a substantial following of readers. In 1998, Mr. Peyton won a "Best of Gannett" award for one of his columns about what the Huntington area didn't provide for his grown son to return home to live and how Marshall University should be more than a football factory. Said the judges:

> "This writer strikes you as a prickly pear in his community. He gets under people's skin and makes them think.

He has a remarkable voice that resonates in an important way. The letter he wrote to his son is indicative of what a lot of people in small towns feel. He gives the newspaper a voice." (See Exhibit A).

Thus, contrary to the respondent's Answer to the Complaint, Mr. Peyton's work reached the level of excellence based on its own grant of a "Best Of" award to him.  Respondent omits this crucial fact in its "Position Statement".

Before filing his Human Rights Complaint, Mr. Peyton filed for unemployment benefits. Under West Virginia's unemployment law, an employer who contests a claimant's application for unemployment benefits bears the burden of proof in establishing that the claimant engaged in acts that constitute simple or gross misconduct. Mr. Peyton successfully applied for and received unemployment benefits.

Although the respondent initially appealed Mr. Peyton's receipt of benefits, and a hearing had been scheduled on the appeal, *the respondent did not prosecute its appeal and offered no evidence in support of any alleged misconduct at any unemployment hearing*. The documents submitted by the respondent in support of its position statement were available at the time of the unemployment hearing and, in fact, respondent's counsel had provided these documents to Mr. Peyton's counsel. The respondent could have offered this evidence if it really believed Mr. Peyton had engaged in alleged misconduct preventing an award of unemployment benefits. It did not. Respondent omits this crucial matter in its "Position Statement."

Respondent also alleges that Mr. Peyton "logged *numerous hours* on-line visiting pornographic web sites" at work. (Emphasis added). That is false. Mr. Peyton did not spend "numerous hours" exploring pornographic sites. Mr. Peyton instead went to the "front pages" of these sites at issue. And, as the printouts from the respondent's exhibits reveal, Mr. Peyton spent very little, if any, time at these sites. To "access" or "enter" these websites, a person must "subscribe" to these sites. Mr. Peyton did not and does not subscribe to these sites at issue, and, consequently, he could not have spent "numerous hours accessing" these sites as the respondent alleges.

In truth, the printout of websites allegedly seen by Mr. Peyton at work includes numerous ordinary sites of general public interest. These sites include:

www.footmad.com
www.bizrate.com
www.computers4sure.com
www.officemax.com
www.wirtcounty.com
www.hurherald.com
www.huntingtonnews.net

www.riverbarge.com
www.tennessean.com
www.knoxnews.com

Respondent's "Position Statement" omits specific reference to the variety of above-listed sites that Mr. Peyton viewed over the course of his work.

In this case, Mr. Peyton was investigating certain internet practices known as "mousetrapping" and "pagejacking." Mousetrapping prevents someone from voluntarily leaving a website. In extreme cases, mousetrapping involves disabling of key browser features, such as the "back" button and endless pop-up ads. "Pagejacking" involves the theft of internet traffic from one site to another and involves fraudulent methods used to direct users from the site they actually request.

At the time of Mr. Peyton's investigation, "mousetrapping" and "pagejacking" were associated with sites involving pornography and gambling. *In fact, within weeks of his investigation of his planned story, one of respondent's newspapers, USA Today, ran a story that specifically addresses "mousetrapping" and "pagejacking".* The story explores the exact issues that Mr. Peyton was planning to write about in his column about the internet: How adult sites use the practices of mousetrapping and pagejacking to grab unsuspecting Web site users and make them look at adult sites. (See Exhibit B). The respondent omits reference to this crucial fact in its "Position Statement".

Respondent also incorrectly suggests that Mr. Peyton "voluntarily" submitted his resignation as a result of his violation of a company rule. As Mr. Peyton's on-line explanation reveals, however, Mr. Peyton has maintained that the policy at issue "*involved the breaking of no law or the violation of any generally accepted journalism ethic.*" He also indicated that he had "no alternative" but to resign his position.

*In defending against the discrimination charges, the respondent fails to appreciate Mr. Peyton's ability and freedom to investigate stories on the internet.* Before his investigation of the above internet practices, Mr. Peyton had worked on a story that required him to attend the "opening night" of a "strip club". Mr. Peyton also worked on a column involving an adult bookstore and its challenge to an injunction. Mr. Peyton received no discipline when he investigated these stories; instead, the Respondent encouraged Mr. Peyton to investigate and develop these stories, which are attached. (Exhibit C).

The enclosed columns passed the eyes of numerous editors before their publication. And Mr. Peyton *never* asked for permission to go to the places involving these columns. This is because he felt it was his right as a journalist to cover these events just as he felt it was his right to explore the sites at issue here on the Web and the devices sites use to capture Web users. In short, the

respondent's policy on the internet contradicts the press and speech freedoms it previously permitted Mr. Peyton in performing his job as an investigative journalist.

Respondent's policies on internet use also do not clearly explain or provide notice concerning what the respondent considers objectionable content. Companies that have a policy on internet use at work will often install "blocking software" to prevent employees from visiting sites that the company deems inappropriate. By "blocking" sites, a company can outline and define those sites it deems objectionable. In this case, however, the respondent offered no "blocking software" to limit any sites it alleges are inappropriate. Moreover, the respondent does not define in any of its policies what constitutes "pornography". Instead, the materials submitted by the respondent provide no explanation of that term and provide no exception for journalists to investigate material that otherwise forms the basis of a news story or column. The lack of any articulated definition of objectionable content provides insufficient notice to not only Mr. Peyton, but the respondent's other reporters as to what it believes constitutes prohibited internet materials.

If the respondent has promulgated any revisions to its internet policy, Mr. Peyton asks that the HRC require respondent to produce such revisions as relevant and probative evidence of the respondent's ability to educate and provide notice to its employees of any internet sites it alleges are not proper for business viewing. Such revisions would reveal the inadequacy of the internet policy on which the respondent wholly predicates its defense of Mr. Peyton's claims.

The respondent, of course, claims that it fired another gentleman, a Mr. Bailey, on February 23, 2001 for violation of the internet policy. Unlike Mr. Peyton, however, Mr. Bailey worked as a "Transient Accounting Collector"—and **not** a journalist. Respondent has not provided the age of Mr. Bailey, which, as the Commission knows, would prove highly relevant if Mr. Bailey were age 40 or more. Additionally, the respondent does not indicate if Mr. Bailey sought legal redress.

Respondent cannot credibly argue that an alleged violation of its internet policy qualifies as a facially-neutral reason for Mr. Peyton's discharge. The above facts reveal that the Respondent had allowed Mr. Peyton journalistic autonomy and its failure to block internet sites reveals no meaningful effort to define any allegedly-prohibited sites. Respondent knew Mr. Peyton was an experienced, 57-year old employee with hip problems. Respondent made absolutely no effort to treat Mr. Peyton fairly in terminating him based on a vague internet policy that infringes on his ability to investigative newsworthy stories. Quite simply, Mr. Peyton submits that the respondent's reason for firing him constitutes an invalid pretext for respondent's motivation to discriminate against him based on his age and health. Therefore we ask that the Human Rights Commission continue proceedings in

this matter, allow the parties to develop evidence and/or issue a finding of probable cause on all charges of discrimination.

Should you have any questions, please feel free to contact my office.

Sincerely,

Hoyt Glazer

Cc: David Peyton
     William A. Behan, Esq.

**Complainant's Certificate of Service**

Docket Number EAD-165-02

I hereby certify that I served a copy of the enclosed Position Statement, with accompanying attachments, and Answer, by certified U.S. Mail on the Respondent's attorney named below:

Mr. William A. Behan, Esquire
Director, Labor Relations and Labor Counsel
Gannet
1100 Wilson Blvd.
Arlington, VA  22234

_____
Signature

_____
1/24/02

Date

## BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

**DAVID PEYTON,**

        **Complainant,**

**v.**
                              **Docket Number: EAD-165-02**
                              **EEOC Number: 17JA200032**

**HUNTINGTON HERALD DISPATCH,**

        **Respondent.**

## NOTICE OF PUBLIC HEARING, ORDER, MEDIATION AND SETTLEMENT DIRECTIVES

**TO:**

Bette Wilhelm
Mediation Coordinator
WV Human Rights Commission
1321 Plaza East, Room 108-A
Charleston, WV 25301

Office of Attorney General
Civil Rights Division
812 Quarrier St. – 2nd Floor
PO Box 1789
Charleston, WV 25326-1789

Rebecca Baker
Certified Court Reporter
Post Office Box 7822
Cross Lanes, WV 25356

David Peyton
3556 Mount Union Road
Huntington, WV 25701

Hoyt Eric Glazer, Esquire
Law Offices of Stuart Calwell
Post Office Box 113
Charleston, WV 25321 - 0113

ATTN: Publisher
Huntington Herald Dispatch
946 Fifth Avenue
Huntington, WV 25701

William A. Behan, Director
Labor Relations and Labor Counsel
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107-0720

You are hereby notified that a public hearing in the above-captioned matter, will convene on the **12th and 13th days of August, 2002, 9:30 a.m. in Cabell County at a place to be later designated in Huntington, West Virginia,** before the undersigned administrative law judge. You have the right to appear at such hearing in person and/or by an attorney.

An attorney not duly licensed and admitted to practice law in the State of West Virginia is directed to Rule 8 of the Rules for the Admission to the Practice of Law, dealing with admissions pro hac vice. Application fees are to be sent to the West Virginia State Bar, 2006 Kanawha Blvd. East, Charleston, West Virginia 25311-2204. You may telephone the State Bar at 304/558-2456, or visit their website at **www.wvbar.org** .

If you are not familiar with the Commission's Rules of Practice and Procedure, you are advised to contact the West Virginia Secretary of State's Office by calling 304/558-6000 or visiting their website at **www.wvsos.com.**

Notice of  Public Hearing
Page 3

The complaint is attached to this notice and incorporated as a part hereof. The respondent is required to file a written verified answer to the complaint within ten (10) days after being served this notice and complaint. Failure to file a timely answer may result in admission to the allegations in the complaint.

Counsel for respondent, **William A. Behan**, Director of Labor Relations and Labor Counsel, has agreed to waive Rule 4 Service of Process and accept service on behalf of the respondent.

**If the designated public hearing date presents a hardship**  **either party, a motion for continuance shall be filed by the affected**  **30 days of service of this notice.  The moving party shall confer**  **counsel  and  provide  the  undersigned  administrative  law  ju**  **alternate public hearing dates as pa**          **confi**  **receipt of the motion, the undersigned will pro**  **alternate hearing date.**

All discovery in this matter shall be completed by March 2 of example, the deadline for service of interrogatories shall be 20 deadline for completion of discovery.

Notice of Public Hearing
Page 4

A prehearing memorandum shall be submitted by the respective parties to the undersigned, and concurrently exchanged between the parties on or before **July 22, 2003**. Counsel is directed to comply with each of the following requirements of the prehearing memo:

1.      Complainant's prehearing memo shall set forth with particularity the complainant's contentions as to liability, including each issue to be addressed and the facts the complainant intends to prove at hearing to sustain each claim. Respondent's prehearing memo shall set forth with particularity the defenses respondent intends to raise at hearing and the facts to be offered in support thereof;

2.      Complainant's and respondent's prehearing memos shall respectively list all documentary or physical exhibits to be offered, with appended copies of documentary exhibits to the memorandum;

3.      Complainant's and respondent's memos shall respectively list all witnesses. If expert witnesses are contemplated, the nature of the expertise should be so indicated; and

4.      Complainant's prehearing memo should set forth the relief sought, any facts related to the issues of relief and proof to be offered in support thereof.

**Notice of Public Hearing**
**Page 5**

Respondent's prehearing memo should set forth any facts related to the issue of relief and proof to be offered in support thereof.

Joint stipulations of undisputed facts as well as joint stipulations as to authenticity and admissibility of documents shall be submitted by the parties to the undersigned on or before **August 5, 2003.**

A settlement conference between the parties shall convene on or before **August 5, 2003**, at a mutually convenient place or by telephone.

**It shall be the responsibility of the moving party to schedule and make all arrangements for a teleconference on any motion made, coordinating such hearing with opposing counsel and the administrative law judge.**

Further, the Commission is involved in a Mediation Project which requires mediation in certain cases **or at the request of the parties,** before an impartial mediator, pursuant to the Rules of Practice and Procedure Before the West Virginia Human Rights Commission, 6 W.Va. C.S.R. 77-2-4.15. The Commission reserves the right to decide if a case will be set for mediation and chooses several weeks throughout the year to conduct these sessions. **Counsel** may contact Bette Wilhelm, Mediation Coordinator, listed below at the Commission's address, to request mediation either by telephone, facsimile or in writing. Although the mediation process

Notice of Public Hearing
Page 6

will run concurrently with the prehearing process, please be advised that, even if the above-captioned matter is selected for mediation, **the public hearing dates and prehearing deadlines remain in full force and effect during the pendency of this matter.**

Finally, **if at any time during the pendency of this matter,** the parties reach a settlement, it shall be the parties responsibility to notify the administrative law judge, **within five days in writing,** of the settlement. The parties shall then provide to the administrative law judge, **no later than 45 days** after the date of the written notification to the administrative law judge, a fully executed **original** settlement agreement and/or a joint motion to dismiss the complaint pursuant to a settlement agreement. Where the complainant is not represented by the Civil Rights Division of the Attorney General's Office, a copy of the documents shall also be served on that division.

Notice of Public Hearing
Page 7

If settlement documents are not received within the allotted time frame,

this matter will proceed to public hearing in accordance with the aforesaid

schedule.

It is so **ORDERED**.

Entered this 3rd day of September, 2002.

WV HUMAN RIGHTS COMMISSION

BY _____

ROBERT B. WILSON
ADMINISTRATIVE LAW JUDGE
ROOM 108A
1321 PLAZA EAST
CHARLESTON, WV 25301-1400
PH: 304/558-2616 FAX: 304/558-0085

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

        Complainant,

v.                                    DOCKET NO. EAD-165-02
                                      EEOC NUMBER 17JA200032
                                      Robert B. Wilson, Administrative
                                      Law Judge

HUNTINGTON HERALD DISPATCH,

        Respondent.

### VERIFIED ANSWER OF RESPONDENT
### GANNETT RIVER STATES PUBLISHING CORPORATION,
### D/B/A THE HERALD-DISPATCH

For Answer to the Complaint filed here by Complainant, Respondent Gannett River States Publishing Corporation, d/b/a The Herald-Dispatch ("The Herald-Dispatch") states as follows

### FIRST DEFENSE

1. Answering the initial unnumbered paragraph of the Complaint, The Herald-Dispatch states that it is without knowledge or information sufficient to form a belief as to the truth of the allegation with respect to the residence of Complainant and accordingly demands strict proof thereof. The Herald-Dispatch admits that its business address is P. O. Box 2017, 946 Fifth Avenue, Huntington, West Virginia 25701. The Herald-Dispatch denies that it has engaged in an unlawful practice within the meaning of The West Virginia Human Rights Act Section 5-11-1 et seq. of the West Virginia Code or otherwise.

2. Answering Paragraph I of the Complaint, The Herald-Dispatch admits that the employment of Complainant terminated on

1

or about June 12, 2001.

3.  Answering Paragraph II of the Complaint, The Herald-Dispatch denies that Complainant was discriminated against because of his age or because of his alleged disabilities.  The Herald-Dispatch states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations with respect to necrosis of cartilage or scar tissue of hip joint or any other disabilities actual or perceived, and accordingly demands strict proof thereof.

4.  Answering Paragraph IIA. of the Complaint, The Herald-Dispatch admits that Complainant was employed in various capacities at The Herald-Dispatch from March 28, 1966 until the date of the termination of his employment, June 12, 2001.  The Herald-Dispatch otherwise denies the allegations of Paragraph IIA of the Complaint.

5.  Answering Paragraph IIB. of the Complaint, The Herald-Dispatch admits that it was and is aware of Complainant's age, but denies that it is aware of any health problems, which would constitute disabilities within the meaning of the definition of "disability" contained in Section 5-11-3 of the West Virginia Code.

6.  Answering Paragraph IIC. of the Complaint, The Herald-Dispatch denies the allegations contained therein.

7.  Answering Paragraph IID. of the Complaint, The Herald-Dispatch denies that Complainant had an "excellent work record" and further denies that Complainant had a "disability" within the

2

meaning of the Act.

8.   Answering Paragraph IIE. of the Complaint, The Herald-Dispatch denies the allegations contained therein.

9.   Except insofar as herein admitted, The Herald-Dispatch denies each and every allegation of the Complaint.

### SECOND DEFENSE

Any actions taken by The Herald-Dispatch with respect to the terms and conditions of Complainant's employment were based upon legitimate and nondiscriminatory reasons.

### THIRD DEFENSE

The Herald-Dispatch denies that it violated any statute, law, or substantiative right of Complainant or substantial public policy, and further denies that it breached any duty whatsoever owed to the Complainant, contractual, statutory, or otherwise.

### FOURTH DEFENSE

The Complainant has failed to allege facts sufficient to establish a prima facie case of either age discrimination or disability discrimination.

### FIFTH DEFENSE

The allegations of the Complaint are not sufficient to advise The Herald-Dispatch of the matters charged or to allow preparation of a defense.

### SIXTH DEFENSE

The Complainant is not disabled within the definition of "disability" contained in Section 5-11-3 of the West Virginia

3

Code.

## SEVENTH DEFENSE

There is no probable cause to believe that The Herald-Dispatch engaged in any unlawful discriminatory practice within the meaning of Section 5-11-9 of the West Virginia Code.

## EIGHTH DEFENSE

The Complaint fails to allege, and Complainant cannot establish or prove, a prima facie case of discrimination.

## NINTH DEFENSE

Legitimate nondiscriminatory reasons exist for all actions of The Herald-Dispatch taken with respect to Complainant.

## TENTH DEFENSE

The Herald-Dispatch asserts and relies upon all other affirmative defenses which may prove applicable to the facts of this matter as they are developed through investigation and discovery, including, without limitation, accord and satisfaction, duress, estoppel, laches, statute of limitations, license, waiver, and any other matter constituting an avoidance or affirmative defense.

WHEREFORE, Gannett River States Publishing Corporation, d/b/a The Herald-Dispatch having fully answered the Complaint asserted against it herein demands that said Complaint be dismissed with prejudice and that it be awarded such other and further relief as the Commission deems appropriate.

GANNET RIVER STATES PUBLISHING
CORPORATION, d/b/a THE HERALD-
DISPATCH

By _____

Its _President & Publisher_


_____
Richard J. Bolen-WV State Bar ID No. 392
HUDDLESTON, BOLEN, BEATTY,
  PORTER & COPEN, LLP
611 Third Avenue
P. O. Box 2185
Huntington, WV 25722
(304) 529-6181
 Counsel for Gannett River
 States Publishing Corporation,
 d/b/a The Herald-Dispatch

5

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

        Complainant,

v.                                          DOCKET NO. EAD-165-02
                                            EEOC NUMBER 17JA200032
                                            Robert B. Wilson, Administrative
                                            Law Judge


HUNTINGTON HERALD DISPATCH,

        Respondent.

### VERIFICATION

STATE OF _West Virginia,_

COUNTY OF _Cabell_ , TO-WIT:

    The undersigned authority, being duly sworn, deposes and says that he/she is the _President & Publisher_ of GANNETT RIVER STATES PUBLISHING CORPORATION, d/b/a The Herald-Dispatch; that he/she has read the foregoing Answer and knows the contents thereof; that the statements and allegations contained therein are true of his/her own knowledge, except as to the matters stated on information and belief and as to those matters he/she believes the same to be true.

                         _____
                         Signature on behalf of Respondent

6

Sep-16-2002 02:47pm From-                            T-072   P.010/011   F-864

The aforesaid Verification of _Leslie Hurst_,

the _president and publisher_ of Gannett River States Publishing

Company, d/b/a The Herald-Dispatch was taken, subscribed and

sworn to before me this _16_ day of _September_, 2002.

[NOTARIAL SEAL]

_Kathy L. Culp_
Notary Public



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
KATHY L. CULP
6510 JEFFERSON DRIVE EAST
HUNTINGTON, WV 25705
My commission expires June 6, 2012

f:\data\rjb\answers\peyton.gannett.atc

7

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

          Complainant,

v.                    DOCKET NO. EAD-165-02
                         EEOC NUMBER 17JA200032
                         Robert B. Wilson, Administrative
                         Law Judge

HUNTINGTON HERALD DISPATCH,

          Respondent.

### CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing VERIFIED ANSWER OF RESPONDENT GANNETT RIVER STATES PUBLISHING CORPORATION, D/B/A THE HERALD-DISPATCH was served upon the following persons by depositing true copies thereof to their last known addresses via United States mail, postage pre-paid (via telecopier 304-558-0085 & certified mail/return receipt in the case of the Administrative Law Judge), from Huntington, West Virginia on the _16th_ day of _September_ 2002.

Hoyt Eric Glazer
Law Offices of Stuart Caldwell
P. O. Box 113
Charleston, WV 25321-0113

Office of Attorney General
Civil Rights Division
812 Quarrier Street, 2nd Floor
P. O. Box 1789
Charleston, WV 25326-1789

**VIA TELECOPIER 304-558-0085 &
CERTIFIED MAIL/RETURN RECEIPT
REQUESTED:**
Robert B. Wilson
Administrative Law Judge
Room 108A
1321 Plaza East
Charleston, WV 25301-1400

David Peyton
3556 Mt. Union Road
Huntington, WV 25701

Richard J. Bolen-WV State Bar ID No. 392
HUDDLESTON, BOLEN, BEATTY, PORTER & COPEN, LLP
611 Third Avenue
P. O. Box 2185
Huntington, WV 25722
(304) 529-6181

## BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

    Complainant

v.

                                      Docket Number: EAD-165-02
                                       EEOC Number: 17JA200032

HUNTINGTON HERALD DISPATCH,

    Respondent.

### <u>MOTION TO TAKE DEPOSITION OF LESLIE HURST</u>

    Comes now the Complainant, David Peyton, by counsel, Hoyt Eric Glazer of the Law Offices of Stuart Calwell, PLLC, and pursuant to Rule 7.16a of the Rules of Practice and Procedure Before the Human Rights Commission files this motion to take the discovery deposition of Leslie Hurst.

    Ms. Hurst participated in the decision to terminate Mr. Peyton and has knowledge of relevant matters involving the complainant's charges. Wherefore, complainant requests that an order be entered that allows counsel for the parties to take the deposition of Ms. Hurst.

COMPLAINANT, DAVID PEYTON,
BY COUNSEL

_Hoyt E. Glazer_

Hoyt Eric Glazer (W.Va. Bar Number 6479)
W. Stuart Calwell   (W.Va. Bar Number 0595)
Law Offices of Stuart Calwell, PLLC
405 Capitol Street
Suite 607
Charleston, West Virginia 25301
304-343-4323
304-344-3684 (Fax)

SENT BY:HBBP&C ; 9-24- 2 ; 2:49PM ; HUDDLESTON,BOLEN-Gannett Company Inc.;# 4/ 4

## BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

    Complainant,

v.

                               Docket Number: EAD-165-02
                               EEOC Number: 17JA200032

HUNTINGTON HERALD DISPATCH,

    Respondent.

### CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing **Motion To Take Deposition of Leslie Hurst,** has been served upon the following counsel of record by depositing a true copy thereof in the United States Mail, postage prepaid, to counsel listed below, on this the 23rd day of September, 2002:

                Richard J. Bolen, Esq.
                Huddleston, Bolen, Beatty,
                Porter & Copen, LLP
                PO Box 2185
                Huntington, WV 25722 - 2185

Hoyt E. Dly

Hoyt Eric Glazer (WV Bar #6479)
Law Offices of Stuart Calwell
405 Capitol Street, Suite 607
Charleston, WV 25301
(304) 343-4323

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

       Complainant,

v.

HUNTINGTON HERALD DISPATCH,

       Respondent.

DOCKET NO. EAD-165-02
EEOC NUMBER 17JA200032

## NOTICE OF SUBSTITUTION OF COUNSEL

NOW COMES the Respondent, Huntington Herald-Dispatch, and advises the Commission that Joseph M. Price and the law firm of Robinson & McElwee, PLLC, 600 United Center, 500 Virginia St. East, P.O. Box 1791, Charleston, WV, 25326, (304)-344-5800 shall be substituted for Richard J. Bolen, Esquire and Huddleston, Bolen, Beatty, Porter & Copen, LLP as Counsel for the Respondent in this matter.

HUNTINGTON HERALD-DISPATCH

By Counsel

Joseph M. Price (#2981)
Robinson & McElwee, PLLC
P.O. Box 1791
600 United Center
500 Virginia St. East
Charleston, WV 25326
(304)-344-5800

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

        Complainant,

v.                                 DOCKET NO. EAD-165-02
                                 EEOC NUMBER 17JA200032

HUNTINGTON HERALD DISPATCH,

        Respondent.

## CERTIFICATE OF SERVICE

    I, Joseph M. Price, do hereby certify that a true and accurate copy of the foregoing **NOTICE OF SUBSTITUTION OF COUNSEL** was served via first class mail to the following counsel of record on this 7th day of October, 2002:

                    Hoyt Eric Glazer, Esquire
                    W. Stuart Calwell, Esquire
                    Law Offices of Stuart Calwell, PLLC
                    405 Capitol Street
                    Suite 607
                    Charleston, West Virginia 25301

                    Joseph M. Price [W.Va. State Bar # 2981]

**BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION**

DAVID PEYTON
         Complainant,

vs.                                                           DOCKET NO. EAD-165-02

HUNTINGTON HERALD-DISPATCH
         Respondent.

**AGREED PROTECTIVE ORDER**

The Parties in this matter have engaged in certain discovery which has the potential to require the disclosure by Respondent of information related to employees of the Respondent other than the Complainant, and Respondent has objected to disclosure of such information upon grounds that, among other things, disclosure of such information may violate an expectation or right of privacy on the part of certain of Respondent's employees.   Upon mature consideration of the record and the arguments of the parties, the Administrative Law Judge finds that the disclosure of such information by Respondent is proper only pursuant to  an appropriate Protective Order.

It is therefore ORDERED, Pursuant to Rule 7.18 of the Rules of Practice and Procedure before the West Virginia Human Rights Commission, and for reasons apparent to the Court, that Respondent disclose information relating to its employees other than Complainant only as follows:

1.       Any and all documents or other information produced in this action by the Respondent concerning the names, addresses,  telephone numbers or any other information or data related to Respondent's employees or former employees other than Complainant,   shall be considered confidential and subject to this Order. Testimony and interrogatory answers regarding the aforementioned matters shall also be considered confidential, without additional designation being required.  In addition, either party may designate as subject to the terms of this Order,  such other information, documents or testimony as it deems appropriate.  Such designation shall be made by

placing the words "Confidential: Subject to Protective Order" upon the face of the document, or otherwise designating the information as subject to this Order.

2.      Any information which is confidential under the terms of this Order shall not be released in any fashion to any person or entity outside of this case. Confidential information shall at all times be safeguarded against accidental or inadvertent disclosure, and shall be used only in connection with the prosecution and defense of the above referenced Complaint before the West Virginia Human Rights Commission.

3.      In the event counsel determines it is necessary to disclose confidential information to a client, expert or co-counsel (outside of counsel of record's firm), then counsel may do so without further notice to the Administrative Law Judge or opposing counsel. However, counsel shall, before disclosing the confidential information, require the client, expert or co-counsel to review a copy of this Order and state his/her agreement to be bound by its terms.

4.      Confidential information shall not be disclosed by the party receiving it except in accordance with this Order. If a party receiving confidential information believes that the information designated as confidential should not be subject to this Order, then counsel shall confer and, if unable to resolve the issue, a motion shall be filed challenging the designation. However, the information subject to the challenged designation shall be treated as confidential until such time as the designation is changed by further Order.

5.      Any confidential information filed with the Administrative Law Judge shall be placed in a sealed envelope clearly marked as being subject to a protective order and warning that the envelope is to be opened only by or upon further Order.

6.      If information designated as confidential is to be used at the public hearing in this matter, counsel intending to use the information shall so advise opposing counsel so that the matter can be resolved or addressed to the Administrative Law Judge.

7.      At the conclusion of this matter, all confidential information, including all copies and materials containing the substance thereof, shall be recovered from experts, parties and co-counsel and returned to the party producing it or certified to opposing counsel as having been destroyed.

8.      Nothing in this Agreed Order is intended as a waiver of other objections the parties may have to the disclosure of information covered herein.

ENTER this 10ᵀᴴ day of _DECEMBER_____, 2002.

_____
Robert B. Wilson
Administrative Law Judge

Inspected and Approved by:

_____
Joseph M. Price
Robinson & McElwee, PLLC
P. O. Box 1791
Charleston, WV 25326-1791
(304) 344-5800
        Counsel for Respondent

_____
Hoyt Eric Glazer
W. Stuart Calwell
Law Offices of Stuart Calwell, PLLC
405 Capitol St.
Suite 607
Charleston, WV 25301
        Counsel for Complainant

STATE OF WEST VIRGINIA
I, _Ivin B. Lee_____,
EXECUTIVE DIRECTOR OF THE WEST VIRGINIA
HUMAN RIGHTS COMMISSION DO HEREBY CERTIFY
THAT THE FOREGOING IS A TRUE COPY FROM THE
RECORDS OF THE COMMISSION GIVEN UNDER MY
HAND AND SEAL THIS _10_ DAY OF _December_ 2___
_____ CLERK
WEST VIRGINIA HUMAN RIGHTS COMMISSION
STATE OF WEST VIRGINIA

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,
    Complainant,

v.             Docket Number: EAD-165-02
                EEOC Number:  17JA200032

HUNTINGTON HERALD DISPATCH,

   Respondent.

## CERTIFICATE OF SERVICE

I, Robert B. Wilson, Administrative Law Judge for the West Virginia Human Rights Commission, do hereby certify that I have served the foregoing **ORDER** by depositing a true copy thereof in the U.S. Mail, postage prepaid this .10th day of December, 2002.

## TO:

David Peyton
3556 Mount Union Road
Huntington, WV 25701

Hoyt Eric Glazer, Esquire
Law Offices of Stuart Calwell
Post Office Box 113
Charleston, WV 25321 - 0113

William A. Behan, Director
Labor Relations and Labor Counsel
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107-0720

Joseph M. Price, Esquire
Robinson & McElwee, PLLC
Post Office Box 1791
Charleston, WV 25326

WEST VIRGINIA HUMAN RIGHTS COMMISSION

ROBERT B. WILSON
ADMINISTRATIVE LAW JUDGE

**BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION**

DAVID PEYTON,

      Complainant

v.

                                         Docket Number: EAD-165-02
                                         EEOC Number: 17JA200032

HUNTINGTON HERALD DISPATCH,

      Respondent.

## COMPLAINANT DAVID PEYTON'S MOTION FOR A PROTECTIVE ORDER

The Respondent, Huntington Herald-Dispatch ("HHD"), has requested the West Virginia Human Rights Commission ("Commission") to compel David Peyton, the Complainant, to produce the "hard drive" of his computer and seeks an Order that compels Mr. Peyton to provide his personal computer to the HHD for a search. For the reasons given in his accompanying Memorandum, Complainant seeks an Order from the Administrative Law Judge that denies discovery of matter which Respondent seeks to compel.

COMPLAINANT, DAVID PEYTON,
BY COUNSEL

Hoyt Eric Glazer (W.Va. Bar Number 6479)
W. Stuart Calwell   (W.Va.)Bar Number 0595)
The Calwell Practice, PLLC
405 Capitol Street
Suite 607
Charleston, West Virginia 25301
304-343-4323304-344-3684 (facsimile)

**BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION**

DAVID PEYTON,

      Complainant

v.

                                              Docket Number: EAD-165-02
                                              EEOC Number: 17JA200032

HUNTINGTON HERALD DISPATCH,

      Respondent.

## COMPLAINANT DAVID PEYTON'S MEMORANDUM IN RESPONSE TO HUNTINGTON HERALD-DISPATCH'S MOTION TO COMPEL DISCOVERY

### Introduction

The Respondent, Huntington Herald-Dispatch ("HHD"), has requested the West Virginia Human Rights Commission ("Commission") to compel David Peyton, the Complainant, to produce his personal home computer in discovery. Complainant has refused to produce his home computer and/or allow respondent to inspect the same based on his expectation of privacy in his home computer and further asserts that the requested materials are not relevant to the issues in this case. In the alternative, even if the materials are relevant, any asserted need of Respondent for the home computer does not outweigh Mr. Peyton's constitutional right to privacy in such materials.

### Facts

Mr. Peyton worked over thirty (30) years for the HHD. In addition to the general columns he wrote for the HHD, Mr. Peyton wrote a weekly column about the internet.

In April 2000, the HHD issued an "Electronic Information Policy" concerning use of the HHD's access to electronic materials, including the internet. The HHD's policy strictly prohibits "pornographic material" accessed on *its* computers or property.  Although Mr. Peyton signed this policy, the HHD did not have any agreement, or proprietary interest concerning use of Mr. Peyton's personal home computer.

On February 16, 2001, the HHD began monitoring its employees' use of the internet. The HHD has never used "blocking software" to define and prohibit access to internet sites it deems inappropriate. As Respondent notes, its IT staff simply types in "nude" and "sex" in a software program when it routinely checks for prohibited sites. At least one member of the HHD's IT staff acknowledges in his deposition that HHD employees may—without detection--possibly access sites that the HHD considers "pornographic material"[1]. Further, if an employee has a personal web-based e-mail account with Yahoo! or other internet provider, the material an employee accesses on his/her personal web-based account may also evade detection by the HHD's software.

To date, the HHD has fired only two persons based on alleged violation of its "Electronic Information Policy". The first person, terminated in February 2001, did not work in the newsroom, or have any journalistic responsibilities. This person did not challenge the termination or bring any legal action against the HHD. Mr. Peyton is the only journalist who has received discipline in excess of a warning involving his use of the HHD's internet access. He is also the only

employee over forty years old (age 57) whom the Respondent terminated based on alleged violation of its internet policy[2]. In fact, Complainant will introduce evidence at the hearing that reveals at least two employees under age 40, received only a warning involving access of an inappropriate site without prior permission.

At the time of his discharge, Mr. Peyton was investigating internet practices known as "mousetrapping" and "pagejacking." "Mousetrapping" prevents someone from voluntarily leaving a website. "Pagejacking" involves the theft of internet traffic from one site to another. The only way to determine that a site has a "mousetrapping" or "pagejacking" device is to access the site. And, at the time of Mr. Peyton's investigation, "mousetrapping" and "pagejacking" were associated with sites involving pornography and gambling.

In this case, the HHD has not produced any logs that reveal Mr. Peyton ever accessed any pornographic sites between February 16, 2001 and June 10, 2001. The logs revealing Mr. Peyton's internet activity at the HHD also reveal that he did not spend substantial time visiting the sites HHD relies on to support Complainant's termination. Rather, on June 11, 2001, the time Mr. Peyton took to check the sites at issue for his research totals less than 15 seconds. And for the most part, each site visited on June 11, 2001, which is at issue, involved an access time of between three (3) to five (5) seconds.  Although the HHD has claimed that Mr. Peyton spent "numerous hours on-line visiting pornographic

---

[1] For example, if an internet address does not contain any string including "nude" or "sex," the address may still contain materials with non-detected strings that contain images that the HHD considers pornography.

websites," the HHD's own logs reveal that claim is false, as previously noted by Complainant. See, December 4, 2001 Position Statement of HHD; January 24, 2002 Response of Complainant.

Although the Respondent claims that Mr. Peyton failed to give his superiors any "advance notice" that he would access the internet sites here, Mr. Peyton never asked for permission to investigate other stories that involved other matters, such as the "opening night" of a "strip club" and an injunction involving an adult bookstore. See, January 24, 2002 Statement of Complainant Responding to HHD's Position Statement. Furthermore, Mr. Peyton will introduce evidence that the HHD never had any intention of allowing him a meaningful opportunity to explain his reason for accessing the sites here[3]. Complainant submits that the Respondent never allowed him a meaningful chance to explain his actions, as compared to a younger employee, whose excuse for visiting certain sites the HHD accepted without the same scrutiny here.

Finally, the reason the HHD could "find absolutely no evidence in its records or on its computers which supported Peyton's claim" is simple: The

---

[2] And, as far as Complainant knows, he is the only person who declared himself "disabled" whom HHD terminated based on his use of the HHD's internet access. As noted in previous correspondence, Mr. Peyton has a hip problem and has undergone surgery on his prostate.

[3] In footnote one of its Memorandum, Respondent states that the evidence will reveal, in part, that employees who accidentally accessed prohibited material reported such access to their supervisors and, where they did so, no discipline was imposed. That is not the entire story, however, and the evidence will reveal that another, younger employee, under the age of 40, accessed an "inappropriate" site, without permission, and spent a long session involving what appeared to be personal ads at Yahoo! This employee did not report the matter; when the HHD investigated this access, however, it accepted the employee's denial of having spent extended time on personal sessions and simply issued a warning to the person. Complainant submits that the HHD did not afford him the same treatment when it terminated him based on his use of the internet.

     The HHD had also issued a warning to another employee about use of its internet access several months before Mr. Peyton's accessed the sites at issue in June 2001. This employee is also younger than Mr. Peyton and under the age of 40.

4

HHD's swift firing of Mr. Peyton prevented his having any opportunity to prepare any draft of his story on the HHD's computer. Throughout its brief, in fact, the HHD fails to consider that Mr. Peyton wished to complete research on his story before beginning a draft of it.

<u>Issue</u>

On January 3, 2003, the Complainant, by counsel, responded to the HHD's Interrogatories and Requests for Production. Subject to any of his objections, Complainant provided information for each of the 16 interrogatories, except for No. 16 which requests Mr. Peyton to provide specific information about his own computer. See Exhibit 2. Mr. Peyton objected to this interrogatory as "not relevant here, nor reasonably calculated to lead to the discovery of admissible evidence. Furthermore, the discovery sought is unduly burdensome, annoying and oppressive and violates complainant's privacy rights." For this reason, the Respondent's Memorandum is incorrect when it states that the Complainant has never presented any objection based on his right to privacy[4].

<u>Argument</u>

Throughout discovery, the Complainant has maintained that the Respondent's request for information and materials involving his home computer is unduly burdensome, annoying and oppressive and violates his privacy rights. In footnote 4 of its Memorandum, therefore, Respondent wrongly suggests that

---

[4] Considering the Respondent's stringent view that Complainant somehow "waived" his objection based on privacy, Complainant notes that the Respondent's Request for Production No. 12 does not technically refer to the actual interrogatory involving Complainant's computer records. That interrogatory, which Complainant objected to on privacy grounds, is No. 16. Request No. 12 refers to Interrogatory No. 14, which does not address electronic information. In any case, the circumstances reveal Complainant timely made his privacy objection known to counsel.

5

Complainant has somehow "waived" his objection on privacy grounds and that this tribunal cannot consider the issue[5].

Where a claim is made that a discovery request is unduly burdensome under Rule 26(b)(1)(iii) of the West Virginia Rules of Civil Procedure, the trial court should consider several factors. First, a court should weigh the requesting party's need to obtain the information against the burden that producing the information places on the opposing party. This requires an analysis of the issues in the case, the amount in controversy, and the resources of the parties. Secondly, the opposing party has the obligation to show why the discovery is burdensome unless, in light of the issues, the discovery request is oppressive on its face. Finally, the court must consider the relevancy and materiality of the information sought. See, Syl. Pt. 3, State Farm Mutual Auto Insurance Company v. Stephens, 425 S.E.2d 577 (W.Va. 1992). Given these considerations, the HHD does not have any need for Mr. Peyton's computer that outweighs his right to privacy in these materials.

West Virginia recognizes that Complainant has a legally protected interest in privacy. See, Roach v. Harper, 143 W.Va. 869, 105 S.E.2d 564 (1958); Syl. Pt. 2, Cordle v. General Hugh Mercer Corp. 325 S.E.2d 111 (W.Va. 1984). Further, in this case, Mr. Peyton has a legally protected privacy interest in the information to be found on his own computer because it is his, not the HHD's, property. The HHD had no agreement with Mr. Peyton concerning use of his own computer and

---

[5] At least one court has noted that the failure to object to a deposition question on privacy grounds does not automatically waive right to privacy and a court will find no waiver if third party rights are at issue. See, Pearce v. Club Med Sales, Inc., 172 F.R.D. 407 (N.D. Cal. 1997). Pearce also provides the balancing test involving discovery of private information, discussed infra.

the language of the agreement Mr. Peyton signed does not apply to his own electronic property. Throughout his employment at the HHD, Mr. Peyton clearly had a legal expectation of privacy in his own, personal computer. Cf. <u>TBG Insurance Services Corporation v. Superior Court of Los Angeles County</u>, 96 Cal.App.4[th] 443, 117 Cal. Rptr.2d 155 (2002), rehearing denied (June 12, 2002)(finding no expectation of privacy in a computer where employee signed a waiver involving use of the computer, which employer gave employee to use).

Relying on <u>R.S. Creative Inc. v. Creative Cotton</u>, 75 Cal. App. 4th 486, 498 (1999), the Respondent claims that, without question, his personal computer is discoverable. Complainant disagrees. <u>R.S. Creative Inc.</u> involved a breach of contract action, not an employment dispute, and did not devote any detailed analysis involving the privacy concerns at issue here. Given the protection afforded to person's privacy rights under the West Virginia Constitution, Complainant submits that the request for virtually everything on his home computer is overbroad and oppressive on its face.

<u>Pearce v. Club Med Sales, Inc.</u>, *supra*, notes that discovery orders are "state-compelled disclosure" and, therefore, the privacy rights protected by a state constitution apply equally to purely private litigation. <u>Pearce</u>, 172 F.R.D. at 410. Further, "[e]ven when discovery of private information is found directly relevant to the issues of ongoing litigation, it will not be automatically allowed, [and] there must then be a 'careful balancing' of the 'compelling public need' for discovery against the 'fundamental right of privacy.' <u>Id</u>., (citations omitted). The test of whether the fundamental right of privacy is outweighed is whether there is

a 'compelling state interest' in discovering the information. Id. The public interest in preserving confidential information outweighs in importance the interest of a private litigant. Id. (citation omitted). As a fundamental liberty, it is protected even from incidental encroachment absent the demonstration of some compelling interest that is both legitimate and overriding. Id., citing Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Even if a compelling interest is found, any inquiry must be narrowly drawn in order to be least intrusive. Pearce, 172 F.R.D. at 410 (citation omitted).

Mr. Peyton defends his use of the HHD's electronic access based on research. Mr. Peyton accessed sites at issue on June 11, 2001. The next day, the HHD called Mr. Peyton and advised him that it had tracked his use of pornographic sites and he did not have any opportunity to use the HHD's computers after this. If, as the HHD states, it did not locate any materials in its office involving Mr. Peyton's internet story, then that should not surprise this tribunal or anyone else. The HHD quickly fired Mr. Peyton and did not allow him an opportunity to use its computer to prepare the story.

Of course, the HHD argues that if Complainant had drafts in progress when he visited the sites in issue then "his claim is somewhat stronger than if no such drafts existed." Respondent's Memorandum at p. 6. This argument strikes Complainant as curious because it does not consider that Mr. Peyton, or any other reporter, might complete the research on a story before beginning a draft of it. And the evidence will reveal that is the case here. Further, if the HHD believes that Complainant has a stronger claim if he had drafts in progress before visiting

8

the sites, how is refusing production of these materials "unfair" to the HHD? Contrary to the HHD's assertion, Mr. Peyton's home computer is simply not the only source available to document or refute his claims.

In reality, the Respondent does not have any compelling need for any discovery of Mr. Peyton's computer. On its face, the request for Mr. Peyton's computer is annoying and embarrassing as it seeks personal information of Mr. Peyton, including those of his family who use the computer. As this tribunal knows, information contained on Mr. Peyton's computer includes his personal finances, correspondence and other personal effects. There is simply no legitimate reason that the Respondent should be allowed to conduct such an intrusive search of the computer, especially when it has ample evidence and effective alternative means to present its case. Allowing the Respondent access to Mr. Peyton's passwords, e-mail, financial data, letters and other personal effects is not going to change the case the Respondent presents and does not serve the public interest in preserving the privacy of confidential information on a personal, home computer.

The burden to Mr. Peyton should also be obvious to this tribunal. Mr. Peyton requires use of his computer for not only his daily living, but requires its use to earn an income. Producing the computer will result in additional expenses and costs for Mr. Peyton. The material on the computer also involves private information of Mr. Peyton's wife and family, which is an additional consideration for not allowing its production.

The HHD is incorrect that Mr. Peyton's home computer is the "only source" available to document or refute his claims. The assertions in the HHD's Memorandum belie its argument. Further, how Mr. Peyton used or uses his home computer does not have any relevance in this case. The HHD fired Complainant based on use of *its* property and its electronic information policy. And the issue here is to determine if HHD discriminated in the application of its electronic policy. That issue does not require searching Mr. Peyton's home computer, which has no relation to the internet policy. The HHD's evidence for terminating Mr. Peyton does not hinge on how he used his own computer—nor could it. The Administrative Law Judge, therefore, should not allow the HHD to engage in a fishing expedition that serves no purpose here.

Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the administrative judge may make such order as justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following measures:

a) That the discovery not be had;

b) That the discovery may be had only on specified terms and conditions, including a designation of the time and place;

c) That the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

d) That certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; . . .

See Generally, Section 77-2-7.18(a)-(i) of the Rules and Practice and Procedure Before the West Virginia Human Rights Commission. In this case, even if Mr. Peyton's home computer were relevant to this matter, which he does not concede, the request unduly burdens Mr. Peyton's privacy rights. As a matter of policy, and based on the ubiquity of the personal home computer and its highly personal nature, this tribunal should refuse to compel Mr. Peyton to produce his computer and/or a search of the same, especially when the HHD can effectively present its case without this discovery.

Conclusion

For the reasons in this Memorandum, those which Complainant may present at hearing, and reasons apparent to this tribunal, the Complainant respectfully requests that the entry of an Order Denying Respondent's Request for Production of Complainant's home computer and Ordering That Discovery Not Be Had As it Involves Complainant's Personal Computer.

COMPLAINANT, DAVID PEYTON,
BY COUNSEL

Hoyt Eric Glazer (W.Va. Bar Number 6479)
W. Stuart Calwell (W.Va. Bar Number 0595)
The Calwell Practice, PLLC
405 Capitol Street
Suite 607
Charleston, West Virginia 25301
304-343-4323 304-344-3684 (facsimile)

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

     Complainant,

v.                                       Docket No. EAD-165-02
                                       EEOC NUMBER: 17J200032

HUNTINGTON HERALD DISPATCH,

     Respondent.

## CERTIFICATE OF SERVICE

I, Hoyt Glazer, counsel for Mr. David Peyton, do hereby certify that I have this 7th day of March, 2003 served true copies of the foregoing **Complainant David Peyton's Motion for a Protective Order** and **Complainant David Peyton's Memorandum in Response to Huntington Herald-Dispatch's Motion to Compel Discovery** upon the following counsel via United States Mail in properly addressed and stamped envelope addressed as follows:

                            Joseph M. Price, Esq.
                            Robinson & McElwee, PLLC
                            P.O. Box 1791
                            Charleston, WV 25326

Hoyt Glazer (WV Bar #6479)
Stuart Calwell (WV Bar #0595)
The Calwell Practice, PLLC
405 Capitol Street, suite 607
Charleston, West Virginia 25301
304-343-4323
304-344-3684 (Fax)

**BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION**

DAVID PEYTON,

        Complainant,

v.

HUNTINGTON HERALD DISPATCH,

        Respondent.

DOCKET NO. EAD-165-02
EEOC NUMBER 17JA200032

**REPLY MEMORANDUM IN SUPPORT OF MOTION BY RESPONDENT
HUNTINGTON HERALD-DISPATCH
TO COMPEL DISCOVERY**

In his Memorandum in Response, Complainant makes several statements of fact which are, at best, misleading, as well as several mischaracterizations of legal precedent. They are:

1)    "To date, the HHD has fired only two persons based on alleged violation of its 'Electronic Communications Policy.' The first person, terminated in February 2001, did not work in the newsroom, or have any journalistic responsibilities." Memorandum Pg. 2.

While this statement is correct, it is misleading. **In fact,** the record is clear that each and every person was terminated if investigation confirmed that he intentionally and knowingly violated the policy by accessing pornographic websites. Only two persons have committed a knowing and intentional violation, and both have been terminated. The first of these occurred in February, 2001, and the second was Mr. Peyton. The fact the other employee was not a "journalist" is irrelevant.

2)    "Mr. Peyton is the only journalist who has received discipline in excess of a warning involving his use of the HHD's internet access." Memorandum, Pg. 2.

**In fact**, Mr. Peyton is the only journalist who knowingly and intentionally violated the policy. The policy, on its face, establishes termination as the penalty for such violation. No other journalist has been terminated because no other journalist has violated the policy as Peyton did.

3)     "(Peyton) is also the only employee over 40 years old ... whom the Respondent terminated based on alleged violation of its internet policy." Memorandum, Pg. 2 – 3.

**In fact**, Mr. Peyton was the only employee over 40 years old who knowingly and intentionally violated the policy, as far HHD has been able to determine. There is no evidence whatsoever that *any employee under the age of 40 intentionally violated the policy and was not discharged.*

4)     "...(F)or the most part, each site (Peyton) visited on June 11, 2001, ... involved an access time of between three (3) to five (5) seconds." Memorandum, Pg. 3.

**In fact**, at least one of the sites was accessed for approximately 7 minutes. Further, Peyton has publicly stated that he "repeatedly allowed" himself to be "mouse-trapped" or "page-jacked" when he accessed these sites. Further, the duration of any access is irrelevant. The policy provides, on its face, that *any* access is prohibited.

5)     "...Mr. Peyton never asked permission to investigate other stories that involved other matters such as the "opening night" of "strip club" and an injunction involving an adult bookstore. Memorandum, Pg. 4.

**Of course not.** Neither Peyton's attending the "opening night" of a "strip club" nor his coverage of an injunction involving an adult bookstore were prohibited by any HHD policy. His accessing pornographic websites, however, was a clear violation of the Electronic

2

Communications Policy. The fact that Peyton covered these "other events" without "asking permission" has no bearing whatsoever on the issues in this case.

6)      "...Peyton will introduce evidence that the HHD never had any intention of allowing him a meaningful opportunity to explain his reason for accessing the sites here." Memorandum, Pg. 4.

**Peyton can produce no such evidence.** When he was called to meet with Ms. Mary Smiley (HHD Human Resources) and his supervisor, James Casto, Peyton was asked why he had accessed the sites and given an opportunity to explain. His only response was that he was "curious." Despite ample opportunity to assert that he was engaged in "legitimate research" he offered no explanation for his conduct. While he now contends that he will provide evidence that he had no "meaningful opportunity" to explain, he has not presented any evidence whatsoever to support that statement. It is simply contrary to the facts.

7)      "Throughout its brief ...HHD fails to consider that Mr. Peyton wished to complete research on his story before beginning a draft of it." Memorandum, Pg. 5.

**The first mention by Peyton** of any work involving a story about "mouse-trapping" or "page-jacking" came 6 days after his termination. So long as Peyton contends that he was conducting "legitimate research" when he intentionally accessed pornographic web sites in violation of the HHD electronic communications policy, the Respondent is entitled to discover and evaluate every scrap of evidence relevant to that claim. The only location upon which such evidence can be located is Peyton's home computer. Only through forensic analysis of his hard drive and related materials can the HHD make that evaluation.

8)      Complainant cites two West Virginia cases to support his assertion that he has a "legally protected interest in privacy." The first of these cases is a trespass action which a

3

plaintiff brought when her landlord installed a listening device on her telephone.  Roach v. Harper, 143 W.Va. 869, 105 S.E.2d 564 (1958).  The second is a case in which the court ruled that public policy may be violated when an employer terminates an employee for refusing to take a polygraph examination.  Cordle v. General Hugh Mercer Corp., 174 W.Va. 321, 325 S.E.2d 111 (1984).  Neither of these cases are analogous to the case at bar since neither involve a plaintiff seeking an order protecting relevant information from discovery.  Mr. Peyton's "privacy" is only at issue because he seeks to withhold information clearly relevant to claims he has asserted in a legal action which he filed.

9)    Complainant cites TBG Insurance Services Corp. v. Superior Court of Los Angles County, 96 Cal. App. 4th 443 (2002) to somehow bolster his claim that he has absolute right to privacy with regard to his home computer.  While the court considered the facts that the employer had provided the employee with the home computer and the employee had signed a waiver upon receiving that computer, the TBG court made it clear that the analysis does not turn on these factors.  According to the court, ". . . even assuming that [Petitioner] has some lingering privacy interest in the information he stored on the home computer, we do not view TBG's demand for production as a serious invasion of that interest."  Id. at 454, citing, inter alia, Vinson v. Superior Court, 43 Cal. 3rd 833, 842 (1987) ("a plaintiff cannot be allowed to make serious allegations without affording the defendant an opportunity to put their truth to the test").

10)    Complainant attempts to discount Respondent's reliance on R. S. Creative Inc. v. Creative Colton, 75 Cal. App. 4th 486 (1999) because the action is based on contract, rather than employment law.  However, as with the case at bar, the opinion was rendered in the context of a discovery dispute.  Thus, the opinion is actually more on point than those cases cited by Complainant.  Furthermore, though Complainant asserts the R. S. Creative Inc. court did not deal

4

with privacy issues, the Court specifically stated that the privacy of the plaintiff had been considered. Id. at 498. In that case, the Plaintiff's personal computer – not one belonging to her employer – was ordered produced.

FOR THE REASONS SET FORTH HEREIN, as well as those reasons set forth in Respondent's original supporting memorandum, Respondent respectfully requests an order compelling production of Complainant's personal computer, which has been shown potentially to contain information highly relevant to the instant issues.

Respectfully submitted,

**HUNTINGTON HERALD-DISPATCH**

By Counsel

Joseph M. Price, Esquire (#2981)
Robinson & McElwee, PLLC
P.O. Box 1791
600 United Center
500 Virginia Street East
Charleston, WV 25326
(304)-344-5800

5

## BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

     Complainant,

v.                                DOCKET NO. EAD-165-02
                                        EEOC NUMBER 17JA200032

HUNTINGTON HERALD DISPATCH,

     Respondent.

### CERTIFICATE OF SERVICE

I, Joseph M. Price, do hereby certify that true and accurate copies of the foregoing **RESPONDENT HUNTINGTON HERALD DISPATCH ANSWERS TO COMPLAINANT'S FIRST SET OF INTERROGATORIES AND FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** was served via first class mail to the following counsel of record on this 11th day of March 2003:

        Hoyt Eric Glazer, Esquire
        W. Stuart Calwell, Esquire
        Law Offices of Stuart Calwell, PLLC
        405 Capitol Street
        Suite 607
        Charleston, West Virginia 25301

        Joseph M. Price [W.Va. State Bar # 2981]

## BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

**DAVID PEYTON,**

   **Complainant,**

**v.**               **DOCKET NO. EAD-165-02**
                   **EEOC NUMBER 17JA200032**

**HUNTINGTON HERALD DISPATCH,**

   **Respondent.**

## JOINT MOTION TO EXTEND DISCOVERY

   COME NOW the Parties, by their respective counsel and MOVE the Administrative Law Judge to EXTEND THE PERIOD FOR DISCOVERY in this matter upon the following grounds:

   1)  The Notice of Public Hearing, Order, Mediation and Settlement Directives issued in this matter on or about September 3, 2002, requires that the parties complete discovery by March 21, 2003;

   2)  The parties have engaged in good faith discovery since the time of the issuance of the Notice of Public Hearing, etc., and discovery has largely progressed satisfactorily;

   3)  The parties have disagreed upon certain issues related to requests by Respondent that the Complainant produce his home computer hard drive and related materials for forensic analysis, and as a result of that good faith dispute, Respondent has filed a Motion to Compel which has been scheduled for telephonic hearing on April 1, 2003;

   4)  Respondent has indicated it wishes to take the deposition of the Complainant, and the Complainant does not object.  The parties mutually believe, however, that it would be more

efficient and less costly to delay the Complainant's deposition until the Administrative Law Judge decides the issues raised through the Motion to Compel;

5) Extending the current discovery period through May 1 would not delay the public hearing or the prehearing proceedings in this matter, since the Prehearing Memorandum is due July 22, 2003, with public hearing currently scheduled for August 12 and 13.

THEREFORE, the parties JOINTLY MOVE the Administrative Law Judge to enter an order extending the current discovery period through May 1, 2003.

Joseph M. Price, Esquire (#2981)
Robinson & McElwee, PLLC
P.O. Box 1791
600 United Center
500 Virginia Street East
Charleston, WV 25326
(304)-344-5800

Hoyt Eric Glazer, Esq. (# 6479)
The Calwell Practice
P. O. Box 113
Charleston, WV 25301
(304)-343-4323

## BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

      Complainant,

v.                               DOCKET NO. EAD-165-02
                                    EEOC NUMBER 17JA200032

HUNTINGTON HERALD DISPATCH,

      Respondent.

### CERTIFICATE OF SERVICE

I, Joseph M. Price, do hereby certify that true and accurate copies of the foregoing **JOINT MOTION TO EXTEND DISCOVERY** was served via first class mail to the following counsel of record on this ___ day of March, 2003:

                Hoyt Eric Glazer, Esquire
                W. Stuart Calwell, Esquire
                Law Offices of Stuart Calwell, PLLC
                P. O. Box 113
                Charleston, WV 25301

                        Joseph M. Price [W.Va. State Bar # 2981]

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

    Complainant,

v.
                                   DOCKET NUMBER: EAD-165-02
                                   EEOC NUMBER:  17JA200032

HUNTINGTON HERALD DISPATCH,

    Respondent.

## ORDER

On **March 24, 2003**, came the Complainant, David Peyton, by counsel, Hoyt E. Glazer, Esquire; and, came the Respondent, Huntington Herald Dispatch, by Joseph M. Price, Esquire, and filed a *Joint Motion to Extend the Discovery*, in the above-captioned matter.

After due consideration of the facts presented herein, the undersigned does **GRANT** said joint motion.

Accordingly, the deadline for completion of discovery in the above-styled matter is extended from **March 22, 2003** to **May 1, 2003**.  No other dates or deadlines will be affected by this extension.

It is so **ORDERED**.

Entered this _26ᵗʰ_ day of March 2003.

                              WV HUMAN RIGHTS COMMISSION

              BY: _____

                              ROBERT B. WILSON
                              ADMINISTRATIVE LAW JUDGE
                              1321 Plaza East, #108-A
                              Charleston, WV 25301-1400
                              Phone: 304-558-2616 FAX: 304-558-0085

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

      Complainant,

v.

                                  **DOCKET NUMBER: EAD-165-02**
                                  **EEOC NUMBER: 17JA200032**

HUNTINGTON HERALD DISPATCH,

      Respondent.

## CERTIFICATE OF SERVICE

I, Robert B. Wilson, Administrative Law Judge for the West Virginia Human Rights Commission, do hereby certify that I have served the foregoing **Order** by depositing a true copy thereof in the U.S. Mail, postage prepaid, this _26_ day of March 2003.

Hoyt Eric Glazer, Esquire            Joseph M. Price, Esquire
The Calwell Practice                  Robinson & McElwee, PLLC
POB 113                             POB 1791
Charleston, WV 25301           Charleston, WV 25326-1791

                                  West Virginia Human Rights Commission

                                       Robert B. Wilson
                                      Administrative Law Judge

2

WEST VIRGINIA
DIRECTOR OF THE WEST VIRGINIA
TS COMMISSION DO HEREBY CERTIFY
FOING IS A TRUE COPY FROM THE
RECORDS OF THE COMMISSION GIVEN UNDER MY
HAND AND SEAL THIS 26th DAY OF March 2003
CLERK
WEST VIRGINIA HUMAN RIGHTS COMMISSION
STATE OF WEST VIRGINIA

BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

DAVID PEYTON,

      Complainant,

v.

                                                Docket No. EAD-165-02
                                                EEOC No. 17JA200032

HUNTINGTON HERALD DISPATCH,

      Respondent.

## ORDER

TO:

| | |
|---|---|
| Hoyt E. Glazer, Esquire | David Peyton |
| LAW OFFICES OF STUART CALWELL | 3556 Mount Union Road |
| POB 113 | Huntington, WV 25701 |
| Charleston, WV 25321-0113 | |
| | |
| Joseph M. Price, Esquire | The Herald Dispatch |
| ROBINSON & MCELWEE, PLLC | 946 Fifth Avenue |
| POB 1791 | Huntington, WV 25701 |
| Charleston, WV 25326-1791 | |
| | |
| William A. Behan, Director | |
| Labor Relations and Labor Counsel | |
| Gannett Co., Inc. | |
| 7950 Jones Branch Drive | |
| McLean, Virginia 22107-0720 | |

It appearing incumbent upon the West Virginia Human Rights Commission, pursuant to the Rules of Practice and Procedure before the West Virginia Human Rights Commission, 6 W. Va. C.S.R. § 77-2-4.15, directed toward the pretrial settlement of Human Rights Commission cases; and it further appearing that the Settlement Week mediation process has proven to be very successful in this and other jurisdictions in arriving at a fair, just, speedy and inexpensive pretrial resolution of numerous administrative actions; and it further appearing, upon review of the matters raised and suggested by the parties herein, that the above-styled action would benefit from such pretrial mediation, it is

ORDERED that this case be, and the same is hereby, scheduled for Settlement Week mediation on **Thursday, May 8, 2003, at 9:00 a.m. at the offices of the West Virginia Human Rights Commission, 1321 Plaza East, Room 108A, Charleston, West Virginia 25301. The parties or their representatives, fully authorized to make final and binding decisions on behalf of the principals, MUST BE PRESENT. Failure to appear with persons authorized to make final and binding decisions as set forth above will result in the imposition of sanction including an award of reasonable mediator and attorney fees and other costs, against the responsible party, as outlined in the Rules of Practice and Procedure before the West**

**Virginia Human Rights Commission, 6 W. Va. C.S.R. § 77-2-4.15.10.** All counsel and parties shall be prepared to negotiate openly and knowledgeably concerning the issues of the case in a mutual effort to reach a fair and reasonable settlement. Failure of any party or counsel to participate in good faith will be immediately brought to the attention of the presiding Administrative Law Judge, who will be available during the mediation of this case.

**If there be any objections to the scheduling of this case for Settlement Week mediation, such objections must be made in form of written motion and filed with the Commission within ten (10) days from the date of the entry of this Order. Absent a showing of good cause why this case should not be included in the Settlement Week mediation, exemption shall not be granted.**

At least ten (10) days prior to the mediation conference, counsel for each party may submit to the Commission and all counsel of record a written factual presentation, not to exceed five (5) pages, with any pertinent supporting documents, other than pleadings, attached.

Mediators are experienced members of the legal profession and are approved by the West Virginia State Bar. Under the auspices of the Commission and the West Virginia State Bar, they have been trained in mediation and fully understand the nature and scope of the obligations which they have assumed. Settlement discussions will be off the record, conducted by an impartial Mediator, subject to the above-referenced Rules of Practice and Procedure before the West Virginia Human Rights Commission. The Mediators will not disclose any of the information divulged by any of the parties or counsel during the settlement discussions unless specifically authorized to do so by that party or counsel.

Parties and their counsel are requested to arrive at the Commission in advance of the scheduled mediation and to sign in with the Mediation Coordinator, Bette F. Wilhelm.

The West Virginia Human Rights Commission recognizes the willingness of the members of the Bar to participate in this alternative dispute resolution program, which, it is believed, will continue to be of substantial benefit to litigants who are involved in a procedure before the Commission.

Date: <u>April 10, 2003</u>

_____
Robert B. Wilson
Administrative Law Judge

Y:\ms858d\Mediation_11_03\Peyton_W\O34A.wpd

2